**Michael Allen LAMBERT, Appellant
(Defendant Below),**

v.

**STATE of Indiana, Appellee
(Plaintiff Below).**

No. 18S00–9107–DP–544.

Supreme Court of Indiana.

Dec. 31, 1996.

Mark Maynard, Hasler & Maynard, Anderson, Ronald McShurley, Muncie, for appellant.

Pamela Carter, Attorney General, Arthur Thaddeus Perry, Deputy Attorney General, Indianapolis, for appellee.

## ON PETITION FOR REHEARING

SELBY, Justice.

This is a petition for rehearing of this Court's decision to affirm the trial court's sentence of death in *Lambert v. State,* 643 N.E.2d 349 (Ind.1994). Lambert was tried, convicted, and sentenced to death for the murder of a police officer. As a result of Lambert's initial direct appeal, and by stipulation of the State, this Court remanded the case to the trial court to reconsider evidence of Lambert's intoxication and its effect as a mitigator under Ind.Code Section 35–50–2–9(c)(6). After reconsideration of the intoxication mitigator, the trial court again sentenced Lambert to death. This Court affirmed that sentence on direct appeal. *Lambert v. State, supra.* Lambert now petitions for rehearing, raising multiple issues. We grant his petition for rehearing solely on the issue of the admissibility of certain victim impact testimony at the sentencing phase of the trial.

On direct appeal, we deemed that the issue of the admissibility of victim impact testimony was waived. We reasoned that Lambert had "assert[ed] error in the admission of victim-impact evidence *only* on grounds that it is contrary to Indiana statutes concerning the probation officer's presentence investigation[,] Ind.Code Section 35–38–1–8.5(a)[,]" and therefore he had waived his relevancy objection to the admission of this evidence. *Lambert,* 643 N.E.2d at 354 (emphasis added).

Lambert notes in his Petition for Rehearing that the objections which he made at trial regarding the admission of this evidence were not limited to statutory concerns. Rather, Lambert consistently objected to the admissibility of the evidence on the grounds that it was irrelevant. For example, he introduced a Motion to Exclude Victim Impact Evidence, and he continually objected to the admission of victim impact evidence during the penalty phase on the basis that this victim impact evidence constituted irrelevant aggravators. Also, in his brief on direct appeal, Lambert argued that the extensive victim impact testimony goes "far beyond the 'quick glimpse'" of the victim's life and the impact of the crime permissible under *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). (Brief for Appellant at 9, 25.) Additionally, Lambert objected to the jury's recommendation because it had been tainted by the extensive victim impact testimony. Thus, a review of the record indicates Appellant did raise relevancy objections to the victim impact testimony at trial and did adequately, though perhaps imprecisely, preserve his objections on appeal. We grant his Petition for Rehearing to review those objections.

## *FACTS*

While *Lambert v. State* contains a full recital of the facts, we will briefly restate them here. During the afternoon of December 27, 1990, Michael Allen Lambert, then a twenty-year-old man, began consuming alcohol. At approximately 8:00 p.m., he went to a bar in Muncie, Indiana where he continued drinking. A little after 1:00 a.m., on December 28, 1990, Muncie police officers were called to an accident scene. At the scene, an officer discovered Lambert attempting to crawl under

a car. When confronted, Lambert explained that he was crawling under the car to go to sleep. The police arrested Lambert for public intoxication. They cuffed Lambert's hands behind his back, gave him a brief pat-down search, and then placed him in the back seat of Officer Gregg Winters' police car. Officer Winters began driving Lambert toward the police station.

A few minutes later, two officers noticed Officer Winters' vehicle approaching them. They then saw Officer Winters' vehicle suddenly slide off the road and into a ditch. Upon investigation, they found Officer Winters with five .25 caliber firearm wounds to the back of his head and neck. Lambert was seated in the back of Officer Winters' police car, and a .25 caliber pistol was laying on the patrol car's floor. Lambert's arms remained handcuffed; his hands, when later examined, showed traces of having been within six inches of the firing of a firearm. The pistol proved stolen from his employer.

At the sentencing phase of the trial, the State presented victim impact testimony in support of the death penalty. Lambert objects to the testimony of three witnesses as improper victim impact testimony: Muncie Chief of Police Donald Scroggins; Officer Terry Winters, a Muncie police officer and the victim's brother; and Molly Winters, the victim's wife.

The court first permitted Chief Scroggins to testify, over Lambert's relevancy objections, about the effect that Officer Winters' death had both on Chief Scroggins personally and on the members of the Muncie Police Department. Chief Scroggins was permitted to testify that at Officer Winters' funeral over twenty different police agencies were represented, and that the Department had received cards and letters from police departments all over the country. He testified that he and other members of the department had sought psychological counseling to cope with Officer Winters' death, and that after the shooting, because he was unable to function as he felt a Chief of Police should, he contacted his physician for prescription medication.

The court next heard from Officer Terry Winters, the victim's brother. Officer Winters testified, over defendant's continued relevancy objections, that his brother had loved being a policeman, and that his brother's death had adversely affected Officer Terry Winters' job performance and attitude toward his job. Officer Winters testified about his other brothers' employment, his father's place of employment, and his mother's place of employment.

Next, Molly Winters, the victim's widow, provided penalty phase testimony regarding her relationship with Officer Gregg Winters. She too testified over defendant's continued objections. She stated that they had been married for six-and-a-half years and that they had two sons, Kyle and Brock, ages four-and-a-half years and twenty months old, who liked sports, roughhousing and bike riding. She was permitted to lay a foundation for admission into evidence of a photo of the family taken the previous Christmas. She testified that Officer Winters was a good father and husband. She further testified that he was a dedicated officer who loved his job, and that she had encouraged him to buy and wear a bullet-proof vest prior to the time that vests were issued by the department. "I told him ... I want you to get a vest and to wear it for added protection because I'm worried about you. I want to make sure that every night that you go to work, you come home safe, and I've got two little babies, and I don't want to raise them by myself." Molly Winters then related the events that occurred between the time of Officer Winters' shooting and his death eleven days later:

State: He survived 11 days, is that correct?

Mrs. Winters: That's correct.

State: Did your boys get to see him in the hospital before he died?

Mrs. Winters: Yeah. I had a couple of doctors that told me don't subject them to that. But I told them they were wrong because it was very important to me that my children know that Daddy went to work. He did his job, and, as we put it, a bad guy got him. And we don't know the outcome, but Daddy is hurt very badly, and we could go and see him and talk to him, but he just can't talk to us.

State: Did the boys go and see him?

Mrs. Winters: I took them back, and I stayed out in the hallway, and I explained to my oldest son, Kyle, what was going on because the baby was nine and a half months and he didn't know. And I said, if you want to touch Daddy, you can, but you don't have to. So we went on in.

When we went in, he asked me numerous questions, you know about the machines and different things, and then he said, Mommy, can you do me a favor? And I said yeah.

He said, can you tell Daddy I love him?

And I said, yeah, I can do that. And I said, do you want to hug Daddy or kiss him?

And he said, no, I better not right now, but I will later. And he said, Daddy, you have good dreams.

So we went out, and then I had Kyle with me the entire time I was in the hospital with Gregg. And every time he asked about his daddy or wanted to see his daddy or tell his daddy something, I took him in.

And the night that we lost Gregg, they moved him to the hospice floor. And when he died, it was more of a homey atmosphere, and I took Kyle in 'cause we had open visitation, and most of the machines were gone, and the sterile atmosphere was gone, and he climbed up on the bed next to Gregg, and he talked to him for the first time without telling me to tell him things. And he said, I love you, Daddy.

And then there was a big window in his room, and Gregg and Kyle, they always went places together. They would dress alike a lot of times. They would go to the bypass and look for semis that they could pass.

State: Did they have identical jogging suits?

Mrs. Winters: Yeah, yeah. They had a couple of identical outfits.

State: Kind of a tradition about McDonald's restaurants?

Mrs. Winters: Yes, yes. They would put their outfits on on payday, and Gregg would take him with him to get his check, and they'd go to the bank, and then it was a boy's day out. They would go to McDonald's on Madison Street, and they would sit at the bar, and they would have lunch together.

And when I had Brock, there were several times that Gregg took Brock, but before they would leave when they didn't take Brock, they would tell him, Brockie, now when you get to be a big boy like Kyle, you get to go too. When you can start eating, then you can have some of my french fries, Brockie, you can go with us. (R. at 5867–70.)

Molly Winters concluded her testimony by advising the jury that Officer Winter's nickname was "Goose" and that she considered him to be a hero.

As noted previously, Lambert objected to the admission of this victim impact testimony. Specifically, Lambert sought to exclude the testimony as not relevant to proof of the "aggravating circumstance alleged; that being that Gregg Winters was a police officer acting in the course of his duty at the time that he was killed." (R. at 5826.) At the penalty phase of the trial, the trial court, citing *Payne v. Tennessee,* permitted the State to present its victim impact evidence.

## DISCUSSION

### I.

■ *Payne* does not stand for the proposition that all victim impact testimony must be admitted. In *Payne,* the Supreme Court concluded only that "if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar." *Payne,* 501 U.S. at 827, 111 S.Ct. at 2609, 115 L.Ed.2d at 736. The Court reasoned that "[a] State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." *Id.*[1] In her concurring opinion, Justice O'Connor made it clear that the

1. The General Assembly has recently come to such a conclusion. Ind.Code Section 35–50–2–

Court's decision in no way mandated the admission of victim impact testimony. Justice O'Connor emphasized that the Court was not thereby holding "that victim impact evidence must be admitted, or even that it should be admitted." *Id.* at 831, 111 S.Ct. at 2612, 115 L.Ed.2d at 739 (O'Connor, J., concurring.)

 This Court has previously taken up the issue of victim impact testimony in capital cases. *See Harrison v. State,* 644 N.E.2d 1243 (Ind.1995), *cert. denied,* —— U.S. ——, 117 S.Ct. 307, 136 L.Ed.2d 224 (1996); *Burris v. State,* 642 N.E.2d 961 (Ind.1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 319, 133 L.Ed.2d 221 (1995); *Bivins v. State,* 642 N.E.2d 928 (Ind.1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 783, 133 L.Ed.2d 734 (1996). In *Bivins,*[2] this Court stated that while *Payne* did away with Eighth Amendment limitations on victim impact testimony, we still recognized that other limitations on the presentation of such evidence remain. Specifically, "for [victim impact statement] evidence to be admissible, it must be relevant to an issue properly before the judge or court." *Bivins,* 642 N.E.2d at 956 (citing *Woods v. State,* 557 N.E.2d 1325, 1326 (Ind.1990), *cert. denied,* 501 U.S. 1259, 111 S.Ct. 2911, 115 L.Ed.2d 1074 (1991)). The *Bivins* Court continued:

> With our determination today that Indiana's statutory death penalty aggravators are the only aggravating circumstances available [when considering whether death or a term of years is the appropriate sentence], the admissibility of the victim impact evidence ... *hinges upon its relevance to the death penalty statute's aggravating and mitigating circumstance.*

*Id.* (emphasis added). Thus, in death penalty cases, the only admissible victim impact testimony is that testimony which is relevant to a statutory aggravating or mitigating circumstance.

In *Bivins,* the victim's wife testified about his relationship with her and her son, and about the impact the death will have on their lives. *Id.* at 957. We determined that the brief, twelve-line victim impact statement was irrelevant, and that it was error to admit it. *Id.* at 642; *see also Harrison v. State,* 644 N.E.2d at 1243 (holding as irrelevant a seven-sentence victim impact statement by deceased's uncle concerning the impact of the murder on the family); *Burris v. State,* 642 N.E.2d at 961 (holding as irrelevant victim impact testimony by deceased's mother concerning the victim's marital status, that he had children, and on his military and work record).

In the present case, the charged aggravating circumstance at Lambert's trial was that the victim was a police officer killed in the course of duty. I.C. § 35–50–2–9(b)(6). The extensive testimony given by Chief Scroggins, Officer Winters, and Molly Winters went far beyond whether or not the victim was a police officer killed in the line of duty. Because the majority of the victim impact testimony given was irrelevant to the charged aggravator, it was improper and should not have been admitted.

## II.

 Although we concluded that the victim impact testimony in *Bivins* was error, we also concluded that its admission was harmless beyond a reasonable doubt.

> Juxtaposed against the strong evidence of the charged aggravating circumstances, and considering the trial court's limiting instruction and the fact that the victim impact evidence was not emphasized in the State's argument to the jury, it is clear that the limited victim impact evidence did not contribute to the jury's death recommendation. We find the admission of such evidence to be harmless beyond a reasonable doubt.

9(e) allows the court, after receiving the jury's recommendation, to hear evidence of the crime's impact on members of the victim's family before making its final determination on sentencing. The facts occurred and the crime was charged and tried in this case prior to the effective date of the statute. We make no ruling today on the impact, if any, of the new statute.

**2.** We apply the law of *Bivins* to the case at bar because "[a]s a newly declared constitutional rule regarding the conduct of criminal proceedings, it is applicable to all cases pending on direct review." *Bivins,* 642 N.E.2d at 956. Lambert's direct appeal was not decided until December 4, 1994, while *Bivins* was decided a month earlier.

*Bivins,* 642 N.E.2d at 957 (citing *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). We held similarly in *Harrison* and *Burris.* In *Harrison,* we held that allowing seven sentences of testimony concerning the impact of the murder on the family was harmless error because it was extremely brief, was not likely to have influenced the jury, and was not referred to by the prosecutor in his closing argument. *Harrison,* 644 N.E.2d at 1261. In *Burris,* we held that allowing court-edited testimony concerning the victim's marital status, work record, and children was harmless error because it did no more than state the victim's status in life and did not generate undue sympathy. *Burris,* 642 N.E.2d at 966.

▮ Thus, although the challenged victim impact testimony was erroneously admitted in the present case, we have in the past ruled that erroneously admitted victim impact testimony does not mandate reversal when the admission of that evidence can be construed as harmless error. An evidentiary error is harmless if the reviewing court determines that "the probable impact [of the improperly admitted evidence] on the jury, in light of all the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties." *Fleener v. State,* 656 N.E.2d 1140, 1141 (Ind.1995); .Ind.Trial Rule 61. Confronted with a similar question, whether a constitutional error in a state court criminal trial was harmless, the United States Supreme Court proposed a similar rule: Errors may be deemed harmless only if the reviewing court can say with some assurance that the error had no substantial influence upon the jury's verdict. *O'Neal v. McAninch,* 513 U.S. 432, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995).

Applying our own "affecting the substantial rights of the party" test as well as the United States Supreme Court's "no substantial influence" test to the case at bar, we must conclude that the admission of the victim impact testimony in this case was not harmless error. The situation presented by the victim impact evidence in this case differs markedly from our previous cases. The trial

court did not give a limiting instruction. The testimony was not brief; it numbers in pages not lines (close to twenty-nine pages in the record). The trial court did not edit the testimony. The testimony went well beyond Officer Winters' status in life, and for that matter well beyond the status in life of his immediate family. Finally, the State did not play a silent part in this testimony. While the victim's widow was giving some of the most compelling, emotional testimony imaginable, the prosecutor was affirmatively inducing Mrs. Winters to continue relating heartbreaking narratives concerning the victim and his sons.[3] The only relevant testimony (under the rule set forth in *Bivins* ) that Chief Scroggins or Terry Winters or Molly Winters testified to was the fact that Gregg Winters was a police officer killed in the line of duty, at most a cumulative paragraph out of twenty-nine pages of testimony.

We cannot say with any degree of confidence that the jury remained uninfluenced by this testimony. Nor can we say with assurance that the substantial rights of Lambert were not affected. Therefore, we must hold that the error in admitting the victim impact testimony was not harmless error.

### III.

▮ Where we find an irregularity in a trial court's decision to impose the death sentence, this Court has various options. As noted in *Bivins,* we may 1) remand to the trial court for a clarification or new sentencing determination, 2) affirm the death sentence if the constitutional error is harmless beyond a reasonable doubt, or 3) independently reweigh the proper aggravating and mitigating circumstances at the appellate level. *Bivins,* 642 N.E.2d at 957. Lambert has twice been before the sentencing authority. Rather than remand for yet another sentencing phase, we use our appellate authority to independently reweigh the proper aggravating and mitigating circumstances. *Id.; Bellmore v. State,* 602 N.E.2d 111, 129 (Ind. 1992).

▮ The charged aggravating circumstance was the killing of a law enforcement officer acting in the course of duty. The State proved beyond a reasonable doubt that Officer Gregg Winters was a law enforcement officer and was at the time of the

---

**3.** Indeed, the testimony of Molly Winters about her husband and hero easily moves one to tears.

shooting acting in the course of his duty. The evidence is also clear and was proven beyond a reasonable doubt that Lambert intentionally killed Officer Winters. Lambert and Officer Winters were the only people in the car, and there is no evidence that the shots could have originated from outside the car. Five shots were fired at close range to the head and neck of Officer Winters, indicating that the intent was certainly to do mortal harm. The shots were also to Officer Winters' back. He had no notice or warning that he was soon to be killed. He had no opportunity to defend himself.

The evidence also presents the possibility of several mitigating circumstances. First, Lambert was intoxicated at the time of the killing. Intoxication can be a mitigating circumstance if it substantially impairs the defendant's capacity to appreciate the criminality of his conduct or conform that conduct to the law. I.C. § 35–50–2–9(c)(6). Lambert was young and had been drinking heavily prior to the shooting. He also came from a family with a history of alcohol abuse. However, Lambert was able to perform the very difficult physical maneuver of shooting Officer Winters, and after the shooting, Lambert was able to converse with the officers who arrived, understand the officers' instructions, and walk by himself. Thus, given what Lambert was able to do and say, we can only afford this mitigator slight weight. As noted in the trial court's extensive evaluation, the only other mitigating circumstances are the defendant's youth (twenty years old at the time of the shooting) and possibility of rehabilitation.

In our final analysis, we must conclude that the statutory aggravator outweighs the mitigators, and that the sentence was appropriate. The killing of a police officer in the course of duty is a most serious crime. Police officers routinely risk their lives in the sometimes high stakes gamble of protecting society. They do a job that we all want and need done, though few of us possess the bravery and skill to do. They ask for little in return, but they do ask for some protection. The General Assembly recognized this in enacting the statutory aggravator of Indiana Code § 35–50–2–9(b)(6). *See Spranger v. State,* 498 N.E.2d 931, 960 (Ind. 1986) (DeBruler, J., concurring and dissenting), *cert. denied,* 481 U.S. 1033, 107 S.Ct. 1965, 95 L.Ed.2d 536 (1987). The seriousness of this aggravator is magnified in the present case due to defendant's use of such deadly force to kill an unaware and unsuspecting police officer in an otherwise nonviolent and ordinary arrest. *See id.* (noting that "[t]he manner, the motivation, and other attendant circumstances of the offense are the type of considerations which may augment the value of this aggravating circumstance.") Balanced against this aggravator, the mitigators do little to counteract its weight.

## CONCLUSION

Because this court cannot say with assurance that the erroneously admitted victim impact evidence did not affect the jury's decision to recommend a death sentence, we hold that the admission of such evidence was not harmless error. On independent reweighing of the statutory aggravators and mitigators, we affirm the trial court's death sentence.

SHEPARD, C.J., and DICKSON, and SULLIVAN, J.J., concur.

BOEHM, J., dissenting with separate opinion.

BOEHM, Justice, dissenting.

I concur in the majority's conclusion that the trial court erred in receiving the heart-trending testimony ably described in the majority opinion. However, I respectfully dissent from the majority's imposition of the sentence in this case. I do so not because I disagree with the result reached by the majority, based on the information available to me. Rather, I dissent because I do not believe it is customary for this or any appellate court to originate a sentence as opposed to reviewing and revising a sentence imposed by the trial court. There may be circumstances where that action is appropriate, but this is not one of them.

In this case the trial court sentenced the defendant after procedural error that requires setting that sentence aside. As appellate judges, we can certainly suppose that an error-free sentencing hearing will produce the same result the trial court reached before and the majority reaches here. There is great force to the desire to bring serious criminal proceedings—and certainly death penalty proceedings—to a prompt resolution,

one way or the other. Moreover, I am very sympathetic to the concern for eliminating the need for the victim's survivors to revisit these horrible events either in the press or in the courtroom. However, for the reasons set forth below, I would remand for a new sentencing hearing.

Article VII, § 4 of the Constitution of our State gives this Court "the power ... to review and revise the sentence imposed" in any criminal appeal. This provision, in my view, does not suggest that we should initiate sentences. Rather it presupposes a validly imposed sentence that we may review and revise. Whether we should frequently exercise that power, and if so what standards we are to apply, are much debated issues. Indeed, the appropriate role of appellate courts in sentencing has generated controversy across the nation. Few, if any, states seek to impose sentences in the first instance by courts that have not seen the evidence and the human beings involved at first hand.

A second aspect of this case leads me to the conclusion that a remand is appropriate. Neither the State nor the defendant briefed the issue of the appropriate disposition if this Court determined that error occurred in the sentencing phase. Under these circumstances I do not believe that our appellate review power should be exercised to deprive the defendant of an opportunity to replead his case against the death penalty in a trial court proceeding conducted in conformity with governing law.

In sum, I would remand, recognizing that there is a distinct possibility that the result directed by the majority would nonetheless ultimately come to pass, attended only by delay and pain for all concerned. In the end, however, we are dealing with an issue, literally, of life or death. I know the majority views this matter with the same gravity as I do. I simply disagree as to the proper balance to strike among these competing considerations.