**Robert A. SMITH, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

No. 77S00–9508–DP–950.

Supreme Court of Indiana.

Oct. 23, 1997.

William G. Smock, Joseph K. Etling, Terre Haute, Amicus Curiae, for Appellant.

Jeffrey A. Modisett, Attorney General, Arthur Thaddeus Perry, Deputy Attorney General, Indianapolis, for Appellee.

SHEPARD, Chief Justice.

Robert Smith pled guilty to the murder of Michael Wedmore under a plea bargain that called for the death sentence. Over Smith's objection, we have reviewed his case to assure that the sentence is a proper one. We now affirm.

### Facts

On June 30, 1995, Robert Smith, Ronald Lunsford, and Michael Wedmore were inmates in the Wabash Valley Correctional Institution in Carlisle, Indiana. Early that morning a correctional officer heard noise coming from Smith's cell. Upon opening the cell door he found Smith and Lunsford repeatedly stabbing Wedmore, Smith with a honed putty knife and Lunsford with one blade of a dismantled pair of scissors. Wedmore died from the thirty-seven stab wounds he received, two of which pierced his heart. An autopsy revealed that the two heart wounds did not come from the same instrument.

The State charged Smith and Lunsford with murder and conspiracy to commit murder. At the initial hearing on July 12, 1995, the court appointed Thomas H. Hicks as Smith's attorney and set trial for September 11, 1995.

On July 23, 1995, Smith mailed a letter to Sullivan Daily Times:

*Editor*

I'm one of the men charged with the murder at [the Wabash Valley Correctional Facility] i understand the county is having aruff time figuring out where there gonna get the money to take this case to

trial. they dont have to on my account if they file the death penalty on me i will pled guilty & wont appeal, if by chance they take the case to trial & find me guilty & give me 50 or 60 more years, if they do that it would be awaste of taxpayers money, my earliest out date in Indiana is 2028, then i have a 15 year parole hold to do in Michigan. i'm 45 years old. as it stands right now ill be in my 90s when i get out. 50-60 more years would be—meaning-less, aslap on the hand, a Joke. Let me tell you just where im coming from if they dont give me the death penalty for the murder of the Baby Killer the next one to die will be a tax payer—*The only tax payers in here "work here"*. I don't say things i dont mean.

Robert A Smith<br>
# 30636

(R. at 188 (capitalization, spelling, punctuation and emphasis in original).)

On July 28, the State requested the death penalty. Accordingly, the court permitted Hicks to withdraw, as he was not qualified under Indiana Criminal Rule 24 to try a capital case, and appointed William G. Smock and Joseph K. Etling. From July to November, Smith's lawyers filed three requests for speedy trial and eventually withdrew all three.

With a trial date of January 22nd looming, on December 27, 1995, the court issued an order requiring Smith to produce handwriting samples for determining whether the letter sent to the Daily Times was in fact written by Smith. On January 4, 1996, the court granted the State a continuance to the State under Criminal Rule 4(B)(1) and set trial for March 11, over Smith's objection, finding that an emergency existed due to the State Police Laboratory's inability to provide a crucial piece of evidence by the January 22 trial date. This upset Smith greatly, as he had desired a speedy trial since July. (*See* R. 529, 540, 601–02, 606.) Thus, when the prosecutor appeared at the prison on January 12 to obtain the handwriting sample, Smith refused to cooperate, leading to his being brought before the court on January 30 for contempt. At the hearing, Smith agreed to comply with the court's order.

The court also addressed a letter Smith sent on January 15 requesting dismissal of his counsel and seeking to proceed pro se, which Smith orally withdrew at the hearing.

On February 14th, the trial court received a second letter from Smith which stated, "Judge Pierson, I would like to change my plea. I no longer feel I can get a fair trial. Too many months have gone by since I filed for a fast and speedy trial. I would appreciate it if you would set a court date in the very near future." (R. at 662–63.) This letter was discussed at a February 26th pretrial conference; Smith stated, against the adamant advice of his counsel, that he was willing to plead guilty if the State would draw up a plea agreement under which Smith would receive the death penalty. The following colloquy ensued:

> THE COURT[:] Mr. Smith, this is highly unusual. You've been charged, sir, with Murder ...

> DEFENDANT[:] I understand that.

> THE COURT[:] ... and Conspiracy to Commit Murder, sir, and the State at a later date has filed what is known as the death penalty. You're request is very unusual, sir.

> DEFENDANT[:] Well, if they don't give me my request the next time I butcher somebody it won't be a, I won't be as selected in my butchering.

> THE COURT[:] Mr. Smith, I need to advise you that you understand ...

> DEFENDANT[:] Well, he filed a death penalty on me. He feels the case merits it. I feel it merits the death penalty, you know. I'm asking the Court to grant that, you know.

> THE COURT[:] But you understand, Mr. Smith, that you have the right to a speedy and public trial by a Jury?

> DEFENDANT[:] I haven't had a fast and speedy ... I've been seven, eight, nine months waiting on a fast and speedy trial, you know.

> THE COURT[:] Do you also understand that you also have the right to require the State of Indiana to bring forward all witnesses against you and to see, hear,

question and cross-examine those persons?

DEFENDANT[:] I understand the case completely. I've read everything that Mr. Smock has got, every piece of paper that he's had access to I've had access to, and I'm just asking the Court and the Prosecutor and he feels it merits the death penalty, I feel it merits the death penalty, draw a contract up and I will sign it and we can get on about our business and quit "pissin'" around with this. If he doesn't do it I'm telling the Court that the next person that I go at won't be a baby killer, it will be a state employee and I will butcher him. It will be a massacre. I'll butcher the son-of-a-bitch.

THE COURT[:] Mr. Smith, I need to inform you, you've had your counsel present, please do not make any further statements against your interests. Do you understand that?

DEFENDANT[:] I know what my interests are. You know, I understand them completely, your [sic] know.

. . . . .

THE COURT[:] Have you been forced to make this statement?

DEFENDANT[:] No, no, no, no, I did it.

(R. 670–73 (quotation marks in original).) Smith's counsel refused to sign such an agreement, stating that Smith had been offered a term of years in exchange for a guilty plea, and thus they could not sign an agreement for the death penalty when a "lesser punishment" had been offered to their client. (R. at 675.)

After a recess, the State submitted a "Negotiated Plea Agreement" signed by Smith which provided that Smith would plead guilty to murder in exchange for the State's recommending the death penalty and dropping the conspiracy charge. The court read through the agreement on the record, asking Smith if he understood each specific aspect of it. Smith's counsel continued to object saying they had, "in fact, advised the defendant of the maximum and minimum penalties, ... advised him that an agreement had been negotiated that called for a much less penalty than the death penalty and that he's well aware of that and he's continuing with this negotiated plea agreement against [their] advice." (R. at 683–84.) The court questioned Smith extensively about his mental capacity and engaged him in a detailed inquiry about each right he would waive by pleading guilty. (R. at 684–91.)

At a plea hearing on March 6th, the court questioned Smith about his signature and initials on the agreement, his mental capacity, and his understanding of the rights he would waive by pleading guilty. (R. at 711–21.) Once the court was satisfied that Smith's plea was knowing and voluntary, the judge and the prosecutor questioned him about the charges against him Smith admitted intentionally stabbing and killing Wedmore while incarcerated though he would not say why. The court entered conviction for murder and took the agreement and the plea under advisement for the purposes of determining whether to accept it. The court then set a sentencing hearing for April 4, 1996, ordered preparation of a presentence report, and informed Smith he could withdraw his plea and proceed to trial anytime before the sentencing hearing.

A few days before the sentencing hearing, Smith's counsel moved to transfer Smith to the Sullivan County jail, pursuant to Indiana Code § 35–33–10–2, and moved for a competency hearing. The court heard these motions at a hearing on April 4. Dr. Howard Wooden, a clinical psychologist who had been examining Smith over the course of many months, testified that Smith was suffering from severe depression which caused him to be incompetent to stand trial or make rational decisions regarding his defense. The cause of this major depression, Wooden said, was Smith's being housed in solitary confinement after killing Wedmore. Wooden stated, "If he was out of the [solitary housing unit] and in a different living situation, he has told me point-blank on two occasions that he would probably change his mind about the death penalty." (R. at 777 (capitalization in original omitted).) This vacillation about wanting the death penalty, depending on whether Smith was kept at Wabash Valley in solitary, caused Wooden to believe Smith in-

competent due to depression. The court denied the motion to transfer and ordered Smith examined by two neutral psychiatric professionals.

At the close of the proceeding, Smith requested the opportunity to speak, which the court granted. Smith stated,

> I don't feel I'm incompetent, you know. I don't think my attorneys feel I'm incompetent. You know, I feel [my attorneys actions are] more of a humanitarian act now, you know, and—you know, I'm through pissing around with it. I mean, you know, I come here today to get sentenced, you know. I mean, that's what I want. You know, my attitude has not changed, you know. You probably could hire 50 psychiatrists and have my attorneys pay half of them and the prosecutor pay half of them and they would come up with 50 different evaluations, you know.
>
> . . . .
>
> . . . I know what I'm doing, you know. I'm fully aware, you know. This is one of the tests they gave me here. I want to read it to the court here, some of the questions on here, and this is how they say I'm extremely depressed, you know. I mean, I'm in prison. Everybody in prison is depressed, you know. I mean, if I was happy, I mean, . . . I wouldn't want to die if I was happy where I was at. I mean, it's no secret, you know. Prison isn't a nice place, you know. I've been in prison for the last 13 years, you know. I'm tired of being in prison, you know, and I'm at the point now where life doesn't have a whole lot of meaning for me and—you know, these are some of the questions that they—Question One, ["]I feel downhearted, blue, and sad.["] It says ["]none or little of the time, some of the time, a good part of the time, more or all of the time.["] I mean, how would anybody in prison answer that question? All of the time. I mean, you know, I'm not living at the Hilton Hotel, you know. The second question is, ["]Morning is when I feel the best.["] You know, I don't feel good any of the time, you know. I'm miserable. You know, my life is miserable. It's a miserable existence. I don't blame anybody for

it, you know. I put myself in prison, you know, and I'm dealing with what I've got to do, you know. . . . Any normal man that's in prison, you know, is, you know, going to feel downhearted, blue, or sad, you know. I mean, I don't see anybody running around the prison smiling and laughing, you know. I mean, it don't happen. . . . ["]My mind is as clear as it used to be.["] My mind is probably more clear now than its ever been. . . . ["]I feel hopeful about the future.["] I don't have a future, you know. I mean, if I don't get the death sentence, I still don't have a future. What I've got is a slow death. I'm asking the court to give me justice, give me—let me die, you know. I mean, I've got a slow death right now, you know. I'm never getting out of prison. You know, I killed somebody. You know, I'm asking the court to give me what I've got coming, you know.

> . . . .
>
> I'm asking the court to get it on. Let's do it and get it over with because you're wasting my time and the court's time, you know. I'm not going to participate in any more psychiatrists or therapists or any of that there, you know. I'm no more incompetent now than I was June 30th when the crime was committed and I will not participate. I mean, if you want to drop the charges on me, go ahead and drop them. If you don't want to drop the charges, then give me what I've got coming and let's get it over with because I'm through pissing around. . . . I'm not going to sit here and have this guy's family sit in here and look at me.

(R. at 815–22 (continual capitalization omitted).)

The court held a hearing concerning Smith's competency on May 15, 1996. The two psychiatric experts appointed by the court testified. The first, Dr. Surjit Singh, found Smith had some depression, but that his depression was not interfering with his ability to understand the proceedings or assist his attorney. Dr. Singh stated that he "was very much impressed that [Smith] was competent." (R. at 844.) Dr. Singh said Smith told him that he did not want to stay

in prison for fifty years and die an old person with a mental disease. According to Dr. Singh, "He has seen other inmates, they are going through the same, and after a couple of years, they start hearing voices, they become psychotic, and they are not in contact with reality, so he does not want to go through all that, and he knows he will be in prison for [sic] long time." Dr. Michael Murphy testified that Smith exhibited two mental disorders, but that neither of them rendered him incompetent to participate in legal proceedings. Murphy agreed with Wooden that Smith's living environment in the solitary housing unit was having a material affect on his decision to seek the death penalty. To Murphy, however, the fact that Smith would change his decision depending on his circumstances suggested competence. Murphy stated,

If he can make his own decision depending upon those circumstances and [it] varies as a consequence, that would indicate his ability to assess and make judgments about his environment and his future actions on the basis of that environment and that he is not inflexibly, as a consequence of mental disorder or disease, unable to exercise that judgment. That led to my conclusion that he was competent.

(R. at 867.)

After the two experts testified, Smith moved to withdraw the plea agreement and proceed to trial pro se while retaining his current counsel as "legal advisors." The court granted his request to withdraw his plea and set a hearing for May 20th to determine whether Smith could proceed pro se.

At the May 20th hearing, the court engaged Smith in a lengthy colloquy about self-representation. In the end, the court concluded that Smith could adequately represent himself, but Smith then withdrew his request, saying he needed some time to think about it. Accordingly, the court withdrew his request to proceed pro se and, pursuant to another speedy trial request from Smith, set trial for July 22, 1996.

On June 4, 1996, Smith sent the court a letter requesting to proceed on his own. The court held a hearing on June 26 concerning the matter. At the conclusion of another exhaustive inquiry, the court determined that Smith understood, and knowingly and voluntarily waived, his right to an attorney. It appointed Smock and Etling as stand-by counsel. Smith requested assurances that stand-by counsel would not be able to object to anything Smith decided to do from that point forward. The court indicated that stand-by counsel would not be able to participate without Smith's permission.

Smith and the prosecutor then submitted a plea agreement identical to the one previously offered. The court interrogated Smith as to whether he had read it, signed it, understood how the plea agreement would affect his case procedurally, and understood he could withdraw it up to the sentencing phase of the bifurcated process. The court then took the plea agreement under advisement, directed the probation department to conduct another pre-sentence investigation, and scheduled a hearing for July 9, 1996.

At the July 9 hearing, the court questioned Smith yet again about his constitutional rights, the charges against him, and his mental capacity. Once satisfied that Smith was competent and fully cognizant of what he was doing, the court asked the State to make a prima facie showing of guilt, which it did through testimony by Smith and others. The court found that Smith knowingly and voluntarily pled guilty to killing Michael Wedmore and that a factual basis existed for the plea, took the plea agreement under advisement, and scheduled a second hearing for July 12.

The July 12 hearing featured discussion of the presentence report. The court offered Smith a chance to supplement it in terms of mitigation, which he declined. The judge also permitted a victim representative to speak. At the conclusion of the hearing, the court found sufficient evidence to support the plea, affirmed the existence of an aggravating factor (Smith's incarceration at the time of the murder), found no mitigating factors, and accepted the plea agreement. Smith was then sentenced to death. Etling and Smock were appointed counsel for appeal.

Counsel had initiated the appeal when Smith filed a request to proceed pro se on his appeal. The trial court held a hearing on Smith's request. Counsel challenged the court's authority to hear the matter, and Judge Pierson certified the jurisdictional question to this Court. We directed him to rule on Smith's pro se request, and further ordered him, should he grant it, to appoint two attorneys qualified under Criminal Rule 24 as amicus curiae to file a brief addressing the issues they believed this Court should review. The trial court did grant Smith's request, and appointed Smock and Etling as amicus.

We allowed the parties to submit written summaries in lieu of oral argument. For his summary, Smith wrote us:

> I Robert A. Smith on June 30, 1995, lured Michael Wedmore to a cell i was being housed in at the Walbash Corr. Inst with the intent of Killing him. i'm proud to say it is the only thing i ever did in my life that turned out as planned although it could of been carryed out a bit more proficient im very satisfied with the results. I'm asking the court to let justice be served & carry out the sentence.
>
> Very Truly yours,
>
> Robert A. Smith

(Pro se Written Summ. in Lieu of Oral Arg., June 20, 1997 (capitalization, spelling and punctuation in the original).)

## I. The Death Penalty and Plea Agreement Statutes

■ Amicus counsel argue that Indiana's death penalty[1] and plea agreement[2] statutes, read together, do not permit negotiated plea agreements for the death penalty. The portions of the plea agreement statute relevant to this argument state, "If the plea agreement is not accepted, the court shall reject it before the case may be disposed of by trial or by guilty plea," and "If the court accepts a plea agreement, it shall be bound by its terms." Ind.Code Ann. § 35–35–3–3(b), (e). The relevant portions of the death penalty statute state:

The state may seek either a death sentence or a sentence of life imprisonment without parole for murder by alleging, on a page separate from the rest of the charging instrument, the existence of at least one (1) of the aggravating circumstances listed in subsection (b). *In the sentencing hearing after a person is convicted of murder,* the state must prove beyond a reasonable doubt the existence of at least one (1) of the aggravating circumstances alleged....

> ....

*If the defendant was convicted of murder in a jury trial, the jury shall reconvene for a sentencing hearing. If the trial was to the court, or the judgment was entered on a guilty plea, the court alone shall conduct the sentencing hearing.*

Ind.Code Ann. § 35–50–2–9(a), (d) (emphasis added). Amicus counsel read these provisions of the death penalty statute as requiring entry of a judgment of guilt before a sentencing hearing can occur. They also read the phrase "before the case may be disposed of" in the plea agreement statute as meaning entrance of a judgment of guilt. Thus, argue amicus, when the two statutes are read together, a peculiar "catch–22" occurs. If a judgment of guilt is first entered by the acceptance of the plea agreement, the plea agreement statute prevents the court from deviating from the agreement. Therefore, the sentencing hearing is meaningless, since the court has already legally committed itself to the death sentence. On the other hand, if the court, in order to determine whether to accept the plea agreement, conducts a sentencing hearing to assess the propriety of the death penalty *before* entering a judgment of guilt, it violates the part of the death penalty statute providing that a sentencing hearing only occurs "after a person is convicted of murder." Ind.Code Ann. § 35–50–2–9(a).

This argument constitutes a colorable claim, but it is ultimately unpersuasive. This Court has long held that "[w]e should, if possible, so construe the two acts before us as to harmonize the same and give full force

---

**1.** Ind.Code Ann. § 35–50–2–9 (West Supp.1996).

**2.** Ind.Code Ann. § 35–35–3–3 (West Supp.1995).

and effect to each." *Ross v. Chambers*, 214 Ind. 223, 226, 14 N.E.2d 1012, 1013 (1938). Finding no indication in either statute of legislative intent to proscribe negotiated plea agreements for the death penalty,[3] we will abide by this principle of statutory interpretation.

■ Construing the phrase "before the case may be disposed of" in the plea agreement statute to mean "before the case may be brought to final conclusion" allows a trial court to conduct the inquiry required by subsection (k)[4] of the death penalty statute before accepting the plea agreement and imposing sentence according to it. Should the court find the statutory requirements for the death penalty are not met, the agreement and the plea would be rejected, a presumptive plea of not guilty entered, and the matter set for trial. Such an interpretation also complements subsection (a) of the plea agreement statute, which states that once a felony plea agreement has been filed, the court must order a presentence report and may "hear evidence on the plea agreement."

Ind.Code Ann. § 35–35–3–3(a) (West Supp. 1996). This subsection calls upon the trial court to perform some level of review in felony plea agreement cases before accepting such agreements and sentencing defendants according to them. We think that to approve an agreement calling for death, the trial court must make the findings specified in the death penalty statute. *See* Ind.Code Ann. § 35–50–2–9(k) (West Supp.1996).

Our review of the careful and extensive procedure employed in Smith's case indicates, for the most part, a proper harmonizing of the two statutes. Once the plea agreement was filed, the court ordered a presentence report and scheduled a bifurcated hearing. At the first hearing, after the court determined a second time that Smith had the capacity to enter into the agreement and that he knowingly and voluntarily waived his rights, the State showed incontrovertible evidence of guilt, and Smith again confessed to the crime. The court determined that the State had made a prima facie showing[5] of guilt, and scheduled a sentencing hearing. At this second hearing,

---

3. Subsection (d) of the death penalty statute states, "If the trial was to the court, or the judgment was entered *on a guilty plea,* the court alone shall conduct the sentencing hearing." Ind.Code Ann. § 35–50–2–9(d) (West Supp.1996) (emphasis added). Given that the statute permits death sentences resting on guilty pleas, it would be absurd to think that the statute would not also permit death sentences based on negotiated plea agreements. The latter is just a specialized version of the former, as under either the defendant admits his guilt and waives his right to a trial. The only difference between the two is that when a defendant enters a general guilty plea he does not reserve for himself any say in the sentence he receives, whereas when he submits a negotiated plea agreement his guilty plea is contingent upon his receiving the sentence for which he bargained. We do not think this distinction warrants precluding negotiated plea agreements from the statute's general permission of death sentences premised upon guilty pleas.

4. The death penalty statute states,

Before a sentence may be imposed under this section, ... the court, in a proceeding under subsection (g), must find that:
(1) the state has proved beyond a reasonable doubt that at least one (1) of the aggravating circumstances ... exists; and
(2) any mitigating circumstances that exist are outweighed by the aggravating circumstance or circumstances.

Ind.Code Ann. § 35–50–2–9(k) (West Supp.1996).

5. The death penalty statute's language indicates contemplation of a conviction of guilt, rather than a prima facie showing of guilt, before the sentencing hearing normally occurs. Ind.Code Ann. § 35–50–2–9(a) (West Supp.1996) ("In the sentencing hearing *after a person is convicted of murder,* the state must prove beyond a reasonable doubt the existence of at least one (1) of the aggravating circumstances alleged.") (emphasis added). Under our interpretation of the plea agreement statute, conviction could be entered on the basis of a plea agreement for the death penalty without tying the hands of the trial court as to its sentencing determination required by subsection (k), thus making unnecessary the Sullivan Circuit Court's withholding entry of conviction the second time until after the sentencing hearing.

We do not read the phrase in the death penalty statute at issue as demonstrating legislative intent to *mandate* entering a conviction before a court can review the propriety of the death sentence. Rather, we believe this phrase indicates the intent of the legislature to divide the death penalty process into guilt and sentencing phases, whereby entrance of conviction would almost always be the line of demarcation between the two. Such division was accomplished in this case, even though Judge Pierson reserved entering judgment of conviction until after hearing evidence on the sentence.

the State showed beyond a reasonable doubt the existence of a statutory aggravating factor, that Smith was incarcerated at the time of the murder. Smith declined to offer any evidence of mitigation, and the presentence investigation report revealed none. Accordingly, the court determined that the aggravating factor outweighed any mitigators, determined the death penalty appropriate, accepted the plea agreement, and sentenced Smith to death. Nothing in this procedure warrants reversal of Smith's sentence.

## II. "Vindictive Justice" and Plea Agreements Recommending Death

■ Amicus counsel argue that negotiated plea agreements for the death penalty violate Indiana's Constitution which states, "The penal code shall be founded on the principles of reformation, and not of vindictive justice." Ind. Const. art. 1, § 18. Without adversarial testing, they argue, "the sentencing judge cannot consider the possibility of reformation before determining that death is an appropriate sentence if the Defendant offers no evidence of mitigation.... Consequently, the lack of any type of adversarial position makes ... Article I, Section 18 unenforceable and void...." (Amicus Br. at 39.)

The text of Section 18, not to mention the long line of precedent interpreting it,[6] belies this argument. Section 18 addresses our penal code as a whole, not its application in a particular case. As this Court stated in *Dillon v. State*, 454 N.E.2d 845 (Ind.1983), *cert. denied*, 465 U.S. 1109, 104 S.Ct. 1617, 80 L.Ed.2d 145 (1984), "Article I, Section 18 ... applies to the penal laws *as a system* to insure that these laws are framed upon the theory of reformation as well as protection of society." *Id.* at 852 (emphasis added). Moreover, it is "an admonition to the legislative branch of the state government and is addressed to the public policy which the legislature must follow in formulating the penal code," *id.*, not a mandate upon the judiciary for determining the appropriateness of the sentence in a particular case.

## III. Voluntariness of Plea and Competency

Amicus counsel claim that severe depression, caused by Smith's solitary confinement and the knowledge he would remain there for a long time, effectively coerced him into entering a plea agreement for the death penalty. Thus, they argue, Smith either acted involuntarily or was incompetent to make the plea agreement.

■ Dr. Wooden, the expert for the defense, testified that Smith's stay in the solitary housing unit at Wabash Valley rendered him so severely depressed that he was willing to do anything to get out, including seeking the death penalty. Drs. Singh and Murphy, the court's experts, found that Smith's placement caused some degree of depression, but that it was not so severe that it rendered him incompetent or his plea involuntary. The conclusions of Dr. Wooden and Dr. Murphy differed principally in evaluating Smith's statement that he would not plead guilty and seek the death penalty if he were not in solitary. To Wooden, this vacillation made Smith incompetent. To Murphy, Smith's ability "to assess and make judgments about his environment and his future actions on the basis of that environment [indicate] that he is not inflexibly, as a consequence of mental disorder or disease, unable to exercise ... judgment," leading to Murphy's finding of competence. (R. at 867 (continuous capitalization omitted).)

■ We review trial court determinations of competency under an abuse of discretion standard. *Barnes v. State*, 634 N.E.2d 46 (Ind.1994). "Where there is a conflict of the evidence submitted by the physicians, this Court generally will not overturn the trial court's determination as long as reasonable grounds exist to support it." *Id.* The assessments by Singh and Murphy appear thorough and reasonable. Smith's own statements and actions show an ability to understand the proceedings and assist in his own defense, even to the point of moving for self-representation when his attorneys continued

---

**6.** *See, e.g., Lowery v. State*, 478 N.E.2d 1214, 1219–20 (Ind.1985) (citing cases); *Driskill v.* *State*, 7 Ind. 338, 342–43 (1855).

to advocate a position contrary to his desired legal end.

Also, there is indication that it was not simply Smith's placement in solitary that influenced his decision to prefer the death penalty over a term of years, but rather his desire not to spend the rest of his life incarcerated, generally. Dr. Singh noted that Smith had voiced a strong desire not to grow old and die in prison, (R. at 831), and Smith stated,

> Prison isn't a nice place, you know. I've been in prison for the last 13 years, you know. I'm tired of being in prison, you know, and I'm at the point now where life doesn't have a whole lot of meaning for me.... I don't have a future, you know. I mean, if I don't get the death sentence, I still don't have a future. What I've got is a slow death. I'm asking the court to give me justice, give me—let me die, you know. I mean, I've got a slow death right now, you know. I'm never getting out of prison. You know, I killed somebody.

(R. at 818–19.) [7] Other courts considering a defendant's preference for death over life imprisonment have concluded it is not per se irrational. *See, e.g., Autry v. McKaskle,* 727 F.2d 358, 363 (5th Cir.), *cert. denied,* 465 U.S. 1090, 104 S.Ct. 1462, 79 L.Ed.2d 909 (1984); *People v. Guzman,* 45 Cal.3d 915, 248 Cal. Rptr. 467, 496–98, 755 P.2d 917, 946–48 (1988). The following quote from *People v. Bloom,* 48 Cal.3d 1194, 259 Cal.Rptr. 669, 774 P.2d 698 (1989), articulates this point well:

> While qualitatively different from the death penalty, the punishment of life imprisonment without hope of release has been regarded by many as equally severe:

"When a person is doomed to spend his final years imprisoned, with no (or few) prospects of release, then in terms of his human dignity, his individuality, his freedom, and his autonomy, one could well argue that the oppressive confines of a prison constitute as great an infringement of his basic human rights as a death sentence." (Sheleff, Ultimate Penalties (1987) p. 56) Life imprisonment without the possibility of parole has been described as " 'not so much a substitute for capital punishment, as a slower and more disadvantageous method of inflicting it.' " (*Id.* at p. 62, quoting penologist William Tallack.) As the philosopher John Stuart Mill put it: " 'What comparison can there really be, in point of severity between consigning a man to the short pang of a rapid death, and immuring him in a living tomb, there to linger out what may be a long life in the hardest and most monotonous toil, without any of its alleviation or rewards—debarred from all pleasant sights and sounds, and cut off from all earthly hope, except a slight mitigation of bodily restraint, or a small improvement of diet?' " (*Id.* at p. 60.)

*Bloom,* 259 Cal.Rptr. at 686 n. 7, 774 P.2d at 715 n. 7. While most people consider death the ultimate penalty, some murderers faced with life imprisonment may rationally disagree, perhaps more so when they, like Smith, know that such a sentence would include an extended stay in solitary.[8]

■ We also affirm the trial court's finding that Smith's plea was voluntary. The evidence does not indicate that Smith's will was overborne by his placement in solitary.

---

7. A similar sentiment was expressed by William Vandiver when explaining his desire to waive appeal of his death sentence:

> I see no sense in wasting everybody's time. At the best that could happen, I would end up doing forty-five years, and I'm going to die there anyway, so why—why prolong it. You know—you know, there is no need. I'm going to die there regardless, so I don't see no sense in setting there when it's going to happen anyway.... Well, to me it [being executed] would be less than getting a tooth pulled. It would be over with. My family wouldn't have to suffer no more, my friends or the people that are concerned. It would be over with. I

see no sense in dragging them around for another ten or fifteen years and have to depend on them. I see no sense in that either.... *Vandiver v. State,* 480 N.E.2d 910, 911 (Ind. 1985). *Cf.* Judge Alex Kozinski, *Tinkering with Death,* The New Yorker, Feb. 10, 1997, at 51 (stating that the desire of a particular convicted defendant in a capital case to "forgo the protracted trauma of numerous death row appeals was rational," and that not honoring such a decision denies the defendant's humanity).

8. The record indicates that Smith faced at least four years in solitary confinement for assaulting and killing Wedmore if he were given a term of years. (R. at 799.)

His decision was the product of a choice between the lesser of two (legal) evils. The court examined Smith extensively on numerous occasions to discern his mental capacity and his understanding of his rights. (R. at 684–91, 711–21, 939–41, 946–57.) His responses to these questions, like his quoted statements set forth above, indicate that his decision to plead guilty was freely, voluntarily, and rationally made.[9]

### IV. Public Policy, the Forced Appointment of Special Counsel, and the Appropriateness of Smith's Sentence

Amicus counsel argue that allowing a defendant to negotiate a plea agreement for the death penalty violates due process and is against public policy. The argument revolves around the contention that "when the Defendant chooses to give up [an] adversarial position and seek the death penalty himself[,] all safeguards, as far as society's interests . . . in making sure the death penalty is only fairly and justly administered, are lost." (Amicus Br. at 36.) As a solution for this perceived problem, amicus, then standby counsel, moved for appointment of special counsel to gather and present mitigating evidence at Smith's sentencing hearing. The trial court denied this motion.

■ Putting aside the issue of whether "stand-by" counsel even had standing to make such a motion, we note that our system maintains a number of safeguards for ensuring the appropriateness of the death sentence even when a defendant enters a negotiated plea agreement for it. First, the trial court cannot accept such a plea agreement until it has made the findings required by subsection (k) of the death penalty statute. Thus, the same considerations go into the sentencing decision even when a defendant does not vigorously oppose it. Second, a defendant cannot waive our review of his

death sentence, though he can waive review of his conviction. *Vandiver v. State*, 480 N.E.2d 910 (Ind.1985); *Judy v. State*, 275 Ind. 145, 416 N.E.2d 95 (1981). As in *Vandiver*, the appropriateness of Smith's death sentence was given "adversarial testing" in this Court, there by the public defender, *Vandiver*, 480 N.E.2d at 912, and here by court-appointed amicus.

Still, amicus counsels' question regarding the effectiveness of such procedures sans the benefit of an adverse party's attempt to present mitigating evidence has led to extended discussion among us. The Court implicitly answered this question by upholding Steven Judy's death sentence even though no mitigating evidence had ever been presented adversarially. *See Judy*, 416 N.E.2d at 100. We will now address this issue explicitly.

■ We see several considerations. First, forcing a defendant personally to present mitigating evidence against his wishes would undermine an accused's right to remain silent during his prosecution. Realizing this, amicus counsel argue that special counsel should have been appointed to argue mitigating evidence in lieu of Smith. They admit that such an appointment would abridge Smith's rights to self-representation, but contend that society's interests in making sure defendants not deserving death do not receive the death sentence and in preventing defendants from using the death penalty statute as a means of state-assisted suicide justify such abridgment.

A defendant's right to self-representation is firmly established in federal constitutional law. In the seminal case of *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), the Court said: "Although not stated in the [Sixth] Amendment in so many words, the right to self-represen-

---

9. Amicus counsel also argue that the trial court erred by declining to transfer Smith to the Sullivan County jail, citing a code provision that states, "The court may order that [a defendant who is already confined in this state under a judgment or court order] be surrendered to the sheriff of the county in which the court issuing the order is located. The court may order the sheriff to convey the defendant from the institution and commit the defendant to the jail or to

another place of custody specified in the order." Ind.Code Ann. § 35–33–10–2(a) (West 1986). We disagree for two reasons. First, there was no justification based on Smith's capacity for judgment or ability to assist counsel to bring him to the jail. Second, Smith's demonstrated dangerousness reasonably could lead the trial court judge to use the discretion available to him to keep Smith in the safekeeping of Wabash Valley.

tation—to make one's own defense personally—is ... necessarily implied by the structure of the Amendment." *Id.* at 819, 95 S.Ct. at 2533. The Court added:

> The right to defend is personal. The defendant, and not his lawyer or the State, will bear the personal consequences of his conviction. It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage. And although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of "that respect for the individual which is the lifeblood of the law."

*Id.* at 834, 95 S.Ct. at 2540–41 (quoting *Illinois v. Allen,* 397 U.S. 337, 350–51, 90 S.Ct. 1057, 1064–65, 25 L.Ed.2d 353 (1970) (Brennan, J., concurring)); *see also People v. Bloom,* 48 Cal.3d 1194, 259 Cal.Rptr. 669, 684–86, 774 P.2d 698, 714–15 (1989) (concluding that the Sixth Amendment requires self-representation for a defendant, even when it is invoked by the defendant expressly to ensure his receipt of the death penalty).

Society does have an interest in executing only those who meet the statutory requirements and in not allowing the death penalty statute to be used as a means of state-assisted suicide. Those interests, however, need not vitiate the defendant's personal rights to represent himself and determine the objectives of his representation. In *People v. Bloom,* the court addressed the issue of death sentence reliability when a defendant does not present mitigating evidence:

> While the United States Supreme Court has frequently stated that the Eighth Amendment and evolving standards of so-

cietal decency impose a high requirement of reliability on the determination that death is the appropriate penalty in a particular case, (*see, e.g., Johnson v. Mississippi,* [486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988) ]; *Mills v. Maryland,* [486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988) ] ), the high court has never suggested that this heightened concern for reliability requires or justifies forcing an unwilling defendant to accept representation or to present an affirmative penalty defense in a capital case. Indeed, the lack of any legal or practical means to force a pro se defendant to present mitigating evidence, or indeed any defense at all, compels the conclusion that the death-verdict-reliability requirement cannot mean that a death verdict is unsound merely because the defendant did not present potentially mitigating evidence. Rather, the required reliability is attained when the prosecution has discharged its burden of proof at the guilt and penalty phases pursuant to the rules of evidence and within the guidelines of a constitutional death penalty statute, the death verdict has been returned under proper instructions and procedures, and the trier of penalty has duly considered the relevant mitigating evidence, if any, which the defendant has chosen to present. A judgment of death entered in conformity with these rigorous standards does not violate the Eighth Amendment reliability requirement.

259 Cal.Rptr. at 690, 774 P.2d at 719. This assessment by the California Supreme Court appears sound. *See also People v. Sanders,* 51 Cal.3d 471, 273 Cal.Rptr. 537, 568–70, 797 P.2d 561, 592–594 (1990).[10]

**10.** *Bloom* and *Sanders* effectively overruled the earlier case of *People v. Deere,* 41 Cal.3d 353, 222 Cal.Rptr. 13, 710 P.2d 925 (1985), which amicus cites in support of its arguments. *Deere* found ineffective assistance of counsel when defendant's attorney acquiesced to his client's instruction not to present mitigating evidence at the penalty phase of a capital trial. The lone dissenter, whose views were later vindicated in *Bloom* and *Sanders,* stated:

> I do not believe that trial counsel is incompetent in failing to parade the defendant's friends or relatives before the court or jury in an attempt to create sympathy for him. To hold that a competent defendant has no right

to make such a choice could seriously infringe upon his personal rights of privacy and dignity. At the very least, the majority's holding is unacceptably patronizing, requiring counsel to override his client's reasoned and informed decision because defendant ultimately cannot be trusted to make sound choices about his own fate. In my view, such a holding comes close to violating the United States Supreme Court's admonition that "forcing a lawyer upon an unwilling defendant is contrary to his basic right to defend himself...."

*Id.* at 25, 710 P.2d at 936 (Lucas, J., concurring and dissenting) (quoting *Faretta v. California,* 422 U.S. 806, 817, 95 S.Ct. 2525, 2532, 45 L.Ed.2d 562 (1975)).

The *Bloom* court also stated that the trial court's grant of a defendant's motion for self-representation made between the guilt and penalty phases, when the court knew that defendant's motivation was to prevent the presentation of mitigating evidence in an attempt to receive the death penalty, did not contravene any policy against state-aided suicide. The court stated, "[I]f the trier of penalty has determined death to be the appropriate punishment, and the death judgment meets constitutional standards of reliability, the judgment cannot reasonably be regarded as the defendant's doing (other than by his commission of the capital crimes) or its execution as suicide." *Id.* at 686, 774 P.2d at 715–16. Although Smith agreed to receive the death penalty, the court could not have accepted the agreement unless the statutory requirements for the death sentence had been met. Thus, as in *Bloom,* "the judgment cannot reasonably be regarded as the defendant's doing." *Id.* at 686, 774 P.2d at 715.

Second, Indiana's statutory framework places the decision about offering evidence of mitigation in the hands of the defendant. Ind.Code Ann. § 35–50–2–9(d) (West Supp. 1996) ("The defendant may present any additional evidence...."). We have characterized this statute as providing a defendant with "the opportunity to present any additional evidence relevant to the aggravating circumstances alleged and to any mitigating circumstances." *Harrison v. State,* 644 N.E.2d 1243, 1260–61 (Ind.1995). If the statute gives the defendant the *opportunity* to offer such additional evidence, but does not require him to do so, it must give him the right to decline to exercise that prerogative.

Finally, we note that the trial court itself, acting through its probation department, causes an investigation of the defendant's background and any mitigating circumstances. This investigation culminates in a report to be considered before determining the appropriateness of the death sentence. Ind.Code Ann. § 35–35–3–3(a) (West Supp. 1996). Discovering such evidence is more difficult when the defendant does not wish to assist, but it is not impossible. It is apparent that the presentence investigation in this case involved a greater effort than would customarily be undertaken.[11]

■ As for the appropriateness of Smith's sentence, the evidence incontrovertibly shows that Smith deliberately and thoughtfully murdered another inmate while incarcerated. By his own admission, Smith and Lunsford lured Wedmore into Smith's cell for the purposes of repeatedly stabbing him with makeshift knives. He offered no mitigating circumstances to counter-balance the aggravating circumstance, nor were any found by Judge Pierson from the presentence report.[12] The probation department made a good faith effort to uncover mitigating evidence despite Smith's refusal to provide it; in spite of that refusal the probation department performed well. The record reflects that Smith's death sentence was appropriate to the nature of the offense and offender.

### V. Sentencing Statement Issues

The trial court issued its first sentencing order on July 12, 1996, following the sentencing hearing held that day. The order listed five "findings," four of which addressed noncapital aggravating circumstances and one which addressed a valid death penalty aggravator. (R. at 463–64.) The court also stated

---

11. For example, the presentence report in this case included a letter to Judge Pierson from Psychologist Michael Murphy regarding his examination of Smith. The letter contains detailed information about Smith's family background and treatment while incarcerated which could potentially have invoked some degree of sympathy for Smith, such as the fact that Smith's father was an alcoholic; that Smith had behavioral problems at an early age, dropped out of school after the seventh grade and began abusing drugs in his adolescence; and that he was battered by prison guards while incarcerated, resulting in his hospitalization and a successful class action suit

against the Department of Correction. (R. at 417.) The trial court apparently did not find this information significant, however, as it noted no mitigating factors in its sentencing statement, (R. at 464), and we do not find such an assessment of this information to be unreasonable.

12. Amicus counsel contend that the court should have found Smith's admission of guilt a mitigating factor. *See, e.g., Gajdos v. State,* 462 N.E.2d 1017 (Ind.1984). Finding such a mitigator and using it to defeat a defendant's agreed sentence seems difficult to justify.

that it did not find any mitigating factors. (*Id.* at 464.)

On July 7, 1997, this Court issued a written order vacating the sentencing order in view of some problems we discerned: the court's findings about aggravating factors not contained in the death penalty statute, the sentencing order's failure to indicate clearly whether the trial court evaluated any evidence of mitigating circumstances enumerated in Indiana Code § 35–50–2–9(c), and its failure to declare that the aggravating circumstances outweighed the mitigating circumstances. We directed the trial court to issue an amended order in light of these problems.

On July 18, 1997, the trial court issued an amended sentencing order. It found that the aggravating circumstance had been proven beyond a reasonable doubt. It held that there were no mitigating circumstances and that the aggravating circumstance outweighed "any mitigating circumstances that exist." (Supp.R. at 5.) It then entered a series of findings on matters relating to lack of remorse and criminal history without calling these mitigators or aggravators. Finally, it found that death was the appropriate punishment and entered sentence in accordance with the plea agreement.

 A court may consider only the charged aggravating circumstances and any mitigating circumstances when determining the appropriateness of the death sentence. *Bivins v. State,* 642 N.E.2d 928 (Ind.1994). When a court errs by considering other aggravators, we may remand for clarification or new sentencing determination, affirm upon finding of harmless error, and reweigh the proper aggravating and mitigating circumstances independently. *Id.* at 957. After carefully considering all aspects of this case, we conclude the trial court's findings on matters not charged as aggravating circumstances were harmless.

We reached a similar conclusion in *Bivins.* Here, as in *Bivins,*

> Significant to our harmless error conclusion is the fact that the trial judge found no mitigating circumstances warranting consideration in the weighing process. While the trial court referred to aggravating circumstances in addition to the charged statutory aggravating circumstance, it expressly found the charged aggravator to be clearly proven beyond a reasonable doubt.

*Id.* However, unlike in *Bivins,* today we do not need to plumb the record to be "decisively convinced that the defendant would have been sentenced to death even without the inclusion of evidence of non-statutory aggravating circumstances." *Id.* at 958. When the death aggravator is proven and the court credibly finds no mitigators, and the parties have agreed to the appropriate sentence, there is little room left under the code for conclusions other than approving the agreement and sentence. Such findings were made by Judge Pierson, and the proof supports him. The trial judge's consideration of additional circumstances when reaching his "personal conclusion" was thus surplusage not needed to justify his acceptance of the plea agreement and his sentencing Smith under its terms. Accordingly, we conclude, as in *Bivins* but for different reasons, that any consideration of non-statutory death aggravating circumstances was harmless beyond a reasonable doubt.

### VI. Victim Impact Evidence

 At the sentencing hearing held July 12, 1996, the court permitted Chris Wedmore, sister of the victim, to make a statement. Her statement encompassed four pages of transcript. It mainly addressed the positive characteristics of the victim, the emotional impact his death had on the family, and the family's request that Smith receive a death sentence to give Smith "what he deserves" and to prevent him from putting another family through the anguish the Wedmores experienced. (R. at 1006–09.)

In *Bivins,* this Court found improper, though harmless, the introduction of victim impact evidence lacking relevance to the charged aggravating circumstances. 642 N.E.2d at 957. In *Lambert v. State,* 675 N.E.2d 1060 (Ind.1996), we reaffirmed *Bivins* principle, but found the victim testimony there was not harmless. The main difference between the two cases revolved around the likely effect of the testimony on the sentencer. Circumstances in *Bivins* led us to believe the evidence had little effect on the sentencing decision, *see Bivins,* 642 N.E.2d

at 957 (noting the strength of the evidence of the valid aggravator, the presence of a limiting instruction, the limited length and content of the victim impact testimony, and the lack of emphasis of the evidence in the State's argument to the jury). The circumstances in *Lambert* led us to believe the evidence probably did have an effect, *see Lambert,* 675 N.E.2d at 1065 (noting the extensive length and heart-wrenching content of the testimony, the absence of a limiting instruction, and the State's repeated inducement of the witness to provide heart-wrenching testimony).

Generally, the length and content of the testimony in this case was not comparable to that in *Lambert.* Unlike the twenty-nine transcript pages of such testimony found there, Chris Wedmore's was not even a full four. Also, while clearly relaying the anguish and anger felt by the Wedmore family over the victim's death, it was not "heartbreaking narrative[ ]," *Lambert,* 675 N.E.2d at 1065, that "easily moves one to tears," *id.* n. 3. Finally, this testimony was offered to the court, rather than to a jury.

It appears clear from the court's sentencing statements that Wedmore's testimony did not affect its sentencing decision. Reference to the testimony appears sparingly in the trial court's first sentencing order ("The victim's family agrees with the Plea Agreement and requests that the Court accept same and impose the sentence of death," (R. at 464)) without any indication that it influenced the judge's "personal conclusion." In the court's amended sentencing order the only reference to the victim representative states, "The Court, pursuant to *I.C.* 35–38–1–2, did appoint a victim representative." (Supp.R. at 4.) We conclude that this testimony had little or no effect on the outcome and thus did not violate the rule of *Bivins.*

## Conclusion

Robert Smith's conviction and death sentence are affirmed.

DICKSON, SULLIVAN, SELBY and BOEHM, JJ., concur.