DENNIS, Circuit Judge,
dissenting:
The ultimate issue is whether a convicted federal capital murder defendant has the absolute right to choose death as his penalty and thus turn his sentencing hearing under the Federal Death Penalty Act of 1994 (“FDPA”)[1] into a charade. The majority misinterprets the record and ignores the district court’s fully supported findings of fact, which show that Davis *386 intends to incur the death penalty by presenting no adversary trial defense whatsoever.[2] The majority errs grievously in interpreting the Supreme Court’s cases as holding that a criminal defendant’s right of self-representation is absolute and that the trial court is therefore powerless to exercise any significant supervision or regulation of the defendant’s use of that right. I respectfully but emphatically dissent.
I. OVERVIEW
The majority commits legal error, in this case of first impression, by holding that a federal defendant convicted of capital murder may, prior to a sentencing hearing conducted under the FDPA, waive his right to counsel and assert his right to self-representation for the purpose of incurring the death penalty by presenting no defense at the sentencing hearing.[3] The *387 majority conceives a criminal defendant’s right to self-representation to be an insuperable right that is not diminished by the dramatic change in the defendant’s autonomy interest resulting from his criminal conviction; an impregnable right that so outweighs the national interest in fairness, accuracy, and equality in federal capital sentencing proceedings that it permits of no significant regulation or supplementation by the trial courts; and a right that is so perfect and untrammeled that the convicted capital offender may, within his complete discretion, use it either to make a defense or to condemn himself to death.
But the majority’s concept differs sharply from the right to self-representation expounded by the Supreme Court. The Court explained in Faretta that “[t]he Sixth Amendment includes a compact statement of the rights necessary to a full defense” and that the right of self-representation is merely one of the constituent rights.[4] It is not an absolute, free-standing right that can run counter to its source, the Sixth Amendment right to make a defense. The Court made this very clear when it said: “The rights to notice, confrontation, and compulsory process, when taken together, guarantee that a criminal charge may be answered in a manner now considered fundamental to the fair administration of American justice — through the calling and interrogation of favorable witnesses, the cross-examination of adverse witnesses, and the orderly introduction of evidence. In short, the Amendment constitutionalizes the right in an adversary criminal trial to make a defense as we know it.... Although not stated in the Amendment in so many words, the right to self-representation — to make one’s own defense personally — is thus necessarily implied by the structure of the Amendment.”[5] In no way did the Court, in Faretta or any other case, ever suggest that self-representation can be separated from the right to make a defense and used negatively to eviscerate the basic Sixth Amendment right to resist the prosecution’s attack, as the majority presently holds.
Because the right of self-representation is implied by and inherently part of the Sixth Amendment right to make a defense, the Supreme Court has recognized many exceptions and qualifications to the exercise of self-representation that enable trial courts to prevent it from being used to harm or defeat the basic right to make a defense. For example, the Court pointed out in Faretta that even when the defendant seeks to use the right of self-representation for the proper purpose of making a defense, the trial court must first determine that the defendant’s waiver of the assistance of counsel is knowing and intelligent and that the defendant is aware of the dangers and disadvantages of self-representation.[6] And “the trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct.”[7] The trial court “may — even over objection by the accused' — appoint a ‘standby counsel’ *388 to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant’s self-representation is necessary.”[8] Moreover, contrary to the majority’s holding in the present case, Faretta left open the trial court’s option of mitigating some of the problems resulting from self-representation by “appointing a qualified lawyer to sit in the case as the traditional ‘friend of the court.’ ”[9]
More recently, the Court affirmatively recognized the amicus counsel option and observed other limitations on the right to self-representation in McKaskle v. Wiggins:
A pro se defendant must generally accept any unsolicited help or hindrance that may come from the judge who chooses to call and question witnesses, from the prosecutor who faithfully exercises his duty to present evidence favorable to the defense, from the plural voices speaking “for the defense” in a trial of more than one defendant, or from an amicus counsel appointed to assist the court.[10]
Accordingly, in Martinez v. Court of Appeal of California, the Court flatly stated that, “[a]s the Faretta opinion recognized, the right to self-representation is not absolute.”[11] After listing several exceptions and qualifications to the right of self-representation, the Martinez Court concluded that “the government’s interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant’s interest in acting as his own lawyer.”[12] Moreover, in holding that Faretta does not require a state to recognize a constitutional right to self-representation on direct appeal from a criminal conviction, the Court in Martinez gave reasons that are significant to the present case:
The status of the accused defendant, who retains a presumption of innocence throughout the trial process, changes dramatically when a jury returns a guilty verdict....
... Yet the overriding state interest in the fair and efficient administration of justice remains as strong as at the trial level. Thus, the States are clearly within their discretion to conclude that the government’s interests outweigh an invasion of the appellant’s interest in self-representation.[13]
*389 The majority’s decision to issue mandamus and reverse the district court’s order is incongruous with all of the Supreme Court’s cases; it permits the right of self-representation to be torn from the body of the basic Sixth Amendment right to make an adversarial defense and to be used to defeat the hopes and aspirations of that basic constitutionalized right. The majority’s prior mandamus should not have issued because the district court was not clearly and indisputably wrong in refusing to allow Davis to waive his right to assistance of counsel and to represent himself. Davis had expressly informed the court that he would not use self-representation to make an adversarial defense as contemplated and protected by the Sixth Amendment.[14] Instead, as he expressly stated, he intended to make no defense whatsoever, so as to ensure a death sentence.[15]' Under these circumstances, the national interest in the fair and efficient administration of justice outweighed the defendant’s interest in acting as his own lawyer, since his purpose was to defeat or relinquish his Sixth Amendment right to make a defense in an adversarial criminal proceeding.[16] The present mandamus should not issue for the same reasons and also *390 because the Supreme Court clearly left open to the district court the option that it pursued on remand, namely, appointing a qualified lawyer to sit in the case as ami-cus curiae or friend of the court to safeguard the national interest in the integrity and fairness of the sentencing hearing and to mitigate some of the damage that will surely result from Davis’s decision not to make any defense against the death penalty-
II. Mitigating FactoRS and the Eighth Amendment
In Woodson v. North Carolina, a plurality of the Supreme Court stated that
the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.[17]
This emphasis on individualized sentencing contributed to what Justice O’Connor would later identify as a
tension that has long existed between the two central principles of our Eighth Amendment jurisprudence. In Gregg v. Georgia [428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)] Justices Stewart, Powell, and Stevens concluded that “where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.” In capital sentencing, therefore, discretion must be “controlled by clear and objective standards so as to produce nondiscriminatory application.” On the other hand, this Court has also held that a sentencing body must be able to consider any relevant mitigating evidence regarding the defendant’s character or background, and the circumstances of the particular offense.[18]
“Thus, the Constitution, by requiring a heightened degree of fairness to the individual, and also a greater degree of equality and rationality in the administration of death, demands sentencer discretion that is at once generously expanded and severely restricted.”[19] Although this seemingly paradoxical result has been challenged by minority views,[20] it remains the Law of the Land that a sentencing body in *391 a capital case must consider any relevant mitigating evidence.[21] As stated by the Court in Penry v. Lynaugh, “[i]n order to ensure ‘reliability in the determination that death is the appropriate punishment in a specific case,’ the jury must be able to consider and give effect to any mitigating evidence relevant to a defendant’s background and character or the circumstances of the crime.”[22]
III. Davis Does Not Have a Clear and Indisputable Right to MaNdamus Relief
In the order presently at issue, the district court explained:
The public has a substantial independent interest in being assured of a full and fair sentencing proceeding, in compliance with constitutional and statutory requirements, so that the death penalty is not imposed arbitrarily and capriciously. In order to accommodate this interest, the Court will appoint independent counsel to investigate and present mitigation evidence at the penalty phase. Counsel will be clearly identified as not representing Davis, and Davis will be permitted to present whatever defense he deems appropriate on his own behalf.[23]
For Davis to establish entitlement to mandamus relief, he “must show not only that the district court erred, but that it clearly and indisputably erred.”[24] Concluding *392 that Davis satisfied this burden, the majority relies on a purported absence of statutory or case law authority and an analogy that it draws between the district court’s order and the judicial appointment of special prosecutors. Both lines of reasoning are flawed and reflect the majority’s misunderstanding of the nature and scope of Davis’s right to self-representation.
A. Statutory Authority and Constitutional Interpretation
Finding “no federal statutory authority for appointing an independent counsel to present mitigation evidence in the penalty phase of a capital case,”[25] the majority conspicuously ignores the Federal Death Penalty Act of 1994.[26] Title 18 U.S.C. § 3593(b) provides that when a criminal defendant is found guilty or pleads guilty to an offense punishable by death, the presiding judge “shall conduct a separate sentencing hearing to determine the punishment to be imposed.”[27] In determining whether a sentence of death is justified, the finder of fact at the sentencing hearing “shall consider any mitigating factor.... ” [28] The ordinary, mandatory meaning of the word “shall”[29] and the comprehensiveness of the FDPA permit only one conclusion: although a defendant may enter a guilty plea and thereby become eligible to receive a death sentence, he is not entitled to a choice of penalty. This conclusion reflects Congress’s effort, in passing the FDPA, to comply with the Supreme Court’s Eighth Amendment jurisprudence, which holds that a death penalty scheme may not limit the sentencer’s consideration of mitigating evidence and corresponding discretion to extend mercy in a given case.[30]
In the typical case contemplated by the FDPA, the convicted defendant presents the mitigating factors that allow the jury to consider a life sentence. But when the adversary system malfunctions, as it does here, the district court is not free to disregard the constitutional and statutory requirement that mitigating evidence and a life sentence be considered. So, while I do not suggest that a convicted defendant can never represent himself and pursue his own strategy in the sentencing phase of a capital case, Davis’s admitted attempt to secure a death sentence by not making a defense creates the impermissible risk that the death penalty will not be imposed in accordance with constitutional and statutory law. Thus, I do not think that the district court, in appointing independent counsel for the limited purpose of presenting mitigating evidence, reached an improper balance between the conflicting self-representation and Eighth Amendment concerns in its effort to maintain the integrity of the sentencing hearing required by the FDPA.
As constitutional scholars have observed, “Whenever possible, conflicting [constitutional] provisions should be reconciled and construed so as to give effect to both.”[31] The Supreme Court has *393 consistently refused to assign priority among the safeguards enumerated in the Bill of Rights.[32] This case presents a conflict between self-representation and Eighth Amendment interests.[33] The district court’s reconciliation of these constitutionally protected interests is manifestly reasonable — so much so that it calls to mind Justice Clark’s admonition that “[t]here is no war between the Constitution and common sense.”[34] In Wheat v. United States, the Court stated that “the essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant .[35] So, “in evaluating Sixth Amendment claims, the appropriate inquiry focuses on the adversarial process ....”[36] While Faretta recognizes a criminal defendant’s right to serve as his own advocate in opposition to the prosecuting authority, neither it nor any of the Court’s other cases may be read to permit the right to be exercised in a non-adversarial manner. “Without opponents, the adversary system cannot function.”[37] Seeking to remedy this defect, the district court attempted to accommodate both the majority’s view of the right of self-representation and the Eighth Amendment requirement that mitigating factors be considered within a capital sentencing proceeding. As the district court explained,
ours is an adversarial system with opposing sides.... The Government is expected to “take a side.” The independent counsel envisioned here is to protect the public interest in the fairness and integrity of the proceeding by assuring that the jury has all the information needed to make an informed decision.[38]
Given the majority’s prior mandamus upholding Davis’s peculiar form of self- *394 representation, the district court struck a reasonable balance between the competing constitutional concerns, thereby giving effect to both. Moreover, because the FDPA, which observes the Eighth Amendment guidelines set forth by the Supreme Court, arguably furnishes a statutory basis for the appointment of independent counsel in this case,[39] I find it impossible to conclude that the district court clearly and indisputably erred.
B. The False Analogy
The majority finds that the district court improperly appointed independent counsel because, “[i]n the reverse but analogous scenario,”[40] a district judge cannot appoint special prosecutors when the government elects not to prosecute. Although the appointment of a special prosecutor in such a case might be viewed as a “reverse scenario,” the analogy is false. Indeed, the majority acknowledges that separation of powers concerns, not involved in Davis’s case, were raised in the special prosecutor context: “ ‘It follows, as an incident of the constitutional separation of powers, that the courts are not to interfere with the free exercise of the discretionary powers of the attorneys of the United States in their control over criminal prosecutions.’ ”[41] In the present case, respect for a coequal branch of government is not at issue. Furthermore, neither the Constitution nor a congressional enactment commits the presentation of mitigating factors in the penalty phase of this capital case to the exclusive discretion of either the government or Len Davis.[42] In the absence of a constitutional or statutory grant of exclusive discretionary power, it simply does not follow that “[tjhere is little distinction between special prosecutors and special (independent) counsel....”[43] Thus, the majority’s scholarly survey of prosecutorial discretion is inapposite to this case.
Although I adhere to my previous statement that the FDPA may provide a statutory basis for the appointment of independent counsel, I also disagree with the majority’s conclusion, drawn from its false analogy, that the district court had no inherent power to appoint an independent counsel. I agree, instead, with the district court’s recognition that “[a]s a general proposition, the authority of a court to appoint independent or amicus curiae counsel is broad and well-established.”[44] The exercise of this authority is particularly appropriate in cases that *395 challenge the proper functioning of the adversary system because a “case conceived in cooperation may be saved by intervention of a genuine adversary who represents the rights that otherwise might be adversely affected.”[45] The district court’s order merely attempts to preserve the adversarial posture required by the constitutional and statutory provisions relevant to this case.[46]
C. Additional Authority Supporting the District Court’s Order
It is true that there are no cases explicitly affirming the propriety of appointing independent counsel to develop and present mitigating evidence in a federal capital sentencing proceeding because of the convicted defendant’s refusal to do so.[47] But it is precisely the res nova status of this case that demands this court’s consideration of any credible authority that addresses the issues now before us. Judge Berrigan examined various state courts’ treatment of the specific issue of appointing independent counsel in a capital sentencing proceeding and found ample support for her order.[48] For example, in Muhammad v. State, the Supreme Court of Florida established the following responsive measures for cases where a convicted defendant refuses to present mitigating evidence:
Having continued to struggle with how to ensure reliability, fairness, and uniformity in the imposition of the death penalty in these rare cases where the defendant waives mitigation, we have now concluded that the better policy will be to require the preparation of a PSI [ (presentence investigation report) ] in every case where the defendant is not challenging the imposition of the death penalty and refuses to present mitigation evidence. To be meaningful, the PSI should be comprehensive and should include information such as previous mental health problems (including hospitalizations), school records, and relevant family background. In addition, the trial court could require the State to place in the record all evidence in its possession of a mitigating nature such as school records, military records, and medical records. Further, if the PSI and the accompanying records alert the trial court to the probability of significant mitigation, the trial court has the discretion to call persons with mitigating evidence as its own witnesses. This precise procedure has been suggested by the New Jersey Supreme Court in State v. Koedatich, 112 N.J. 225, 548 A.2d 939, 992 (1988), and recognized as appropriate by the Georgia Supreme Court in Morrison v. State, 258 Ga. 683, 373 S.E.2d 506, 509 (1988). If the trial court prefers that counsel present mitigation rather than calling its own mtnesses, the trial court possesses the discretion to appoint counsel to present the mitigation as was done in Klokoc v. State, 589 So.2d 219 (Fla.1991) or to utilize standby counsel for this limited purpose.[49]
*396 In Florida, the jury serves in an advisory capacity only; the trial judge makes the final penalty decision. When a convicted defendant does not oppose the death penalty, the now-mandated presentence investigation report facilitates an informed decision as to whether a death sentence should be imposed by providing the trial judge with the available mitigating evidence or alerting him, in certain cases, to “the probability of significant mitigation.”
In Smith v. State,[50] the Supreme Court of Indiana found no error in a trial court’s refusal to appoint special counsel to gather and present mitigating evidence at the sentencing hearing of a defendant who negotiated a plea agreement that called for the death penalty. Although the court reached a different conclusion from its Florida counterpart on the propriety of appointed counsel, it noted that Indiana law requires the trial court, acting through its probation department, to investigate the defendant’s background and any mitigating circumstances.[51] This investigation “culminates in a [presentence] report to be considered before determining the appropriateness of the death sentence.” [52] The court admitted that discovering mitigating evidence “is more difficult when the defendant does not wish to assist, but it is not impossible.”[53] It then found that the probation department made a “good faith effort” to uncover mitigating evidence despite Smith’s refusal to provide it and concluded that the presentence report and the record as a whole “reflects that Smith’s death sentence was appropriate to the nature of the offense and offender.” [54]
The FDPA, on the other hand, states that “no presentence report shall be prepared” when a defendant is found guilty or pleads guilty to an offense punishable by death.[55] The jury — or the court alone if there is no jury — is therefore limited to the information received during the sentencing hearing.[56] Thus, the district court recognized the importance of presenting mitigating evidence at the hearing, “as that is the only opportunity for it to be heard.”[57] While Davis can certainly control the information he gives, today’s decision by the majority extends his control to all mitigating evidence, regardless of its source or potential impact on the sentencing body. The district court reasonably concluded that a death sentence obtained in such a distorted manner is likely to fall short of constitutional standards of reliability.
Like the majority, the states that have taken an absolutist position on the convicted defendant’s right to self-representation have done so in misguided reliance on the Supreme Court’s decision in Faretta.[58] But in its most recent pronouncement on Faretta, Martinez v. Court of Appeal of California, the Supreme Court recognized that “the right to self-representation is not absolute,” that “[e]ven at the trial level ... the government’s interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant’s interest in acting as his own lawyer,” and that “[t]he status of the accused defendant, who re *397 tains a presumption of innocence throughout the trial process, changes dramatically when a jury returns a guilty verdict.”[59] “[T]he autonomy interests that survive a felony conviction are less compelling than those motivating the decision in Faret-ta.”[60] “Yet the overriding state interest in the fair and efficient administration of justice remains” constantly strong throughout the trial and appeal.[61]
As in an appeal, the defendant entering the sentencing phase of a capital case has already been convicted. Applying Martinez by analogy to the present case, it follows that Len Davis’s autonomy interests, which became léss compelling after his conviction, have been further diminished by the purpose for which he seeks to act as his own attorney. His purpose is neither to disengage from unreliable or incompetent counsel nor to make a personal, adversarial defense, but rather to ensure a death sentence by offering no defense at all. The holding and reasoning of Faretta do not sanction self-representation by a convicted defendant who seeks to render himself defenseless against the death penalty. In other words, the autonomy interests that survived Davis’s conviction are now outweighed by the public’s interest in the fair and faithful administration of justice, an interest that is even more acute in a death penalty case. Therefore, the district court’s appointment of independent counsel to represent this national interest did not deprive Davis of a constitutional right.
Len Davis does not have an absolute right to his desired sentence.[62] The district court understood this, and its meticulous consideration of the issues before it further demonstrates that the extraordinary writ of mandamus should not issue again in this case. The majority’s decision to the contrary plainly retrogresses from the constitutional command that “capital punishment be imposed fairly, and with reasonable certainty, or not at all.”[63]
IV. CONCLUSION
In my opinion, the district court reached the correct result in May 2001 when it refused, based on the facts of this particular case, to permit Len Davis to waive his right to counsel and to represent himself at his capital sentencing hearing, and the majority erred in issuing its first mandamus setting the district court’s ruling aside. In the present proceedings, given the situation in which the majority placed the district court by issuing its first man *398 damus, the district court’s August 2001 order appointing independent counsel for the limited purpose of presenting mitigating evidence at the sentencing hearing was not clearly and indisputably wrong. The majority’s contrary conclusion and second mandamus voiding the district court’s ruling perverts Faretta, ignores the national public interest in the fair and faithful administration of the federal capital punishment system, and converts the sentencing hearing into a non-adversarial criminal proceeding not contemplated by the Sixth Amendment or the FDPA.[64]

. See 18 U.S.C. §§ 3591-3598.

. The majority closes its eyes to the fact that Davis has no adversary trial strategy, that he only claims, instead, to have a post-conviction strategy, and, most important, that he is actively seeking a death sentence rather than a life sentence. See infra notes 14-15. Crediting Davis's assertion that he is not on a "suicide mission,” the majority states that "it appears as though Davis will be utilizing his 'residual doubt' argument during the penalty trial,” Maj. Op. at 384 n. 6, in an effort "to attack the strength of the government's case as to his guilt.” Id. at 384. But Davis’s own words reveal that his sole motivation is to receive the death penalty, and he has gone so far as to threaten to do nothing at the sentencing trial in order to realize this goal. At a July 26, 2001 hearing, the district court indicated, for the first time, its intention to appoint amicus counsel for the purpose of developing and presenting mitigating evidence. Davis issued the following ultimatum in response:
[I]f this case doesn't go forward on August the 13th [, 2001], ... I am coming in this courtroom and there will be no residual doubt argument, there will be no cross-examination, there will be no opening and closing statements, and I have already made it clear that I’m wearing just what I'm wearing [ (a prison jumpsuit) ].
... I'll come in this courtroom, sit down with no problems, and will do absolutely nothing if this case doesn’t go forward August the 13 th.
Furthermore, even if the majority's statement that Davis is not on a "suicide mission” is correct, his ironic belief that a death sentence might ultimately save his life is irrelevant. As the amicus response correctly states, "Both parties in this case seek the same outcome from the district court — a sentence of death.... Petitioner’s decision to actively seek a death verdict at the trial level causes the adversary system to disintegrate. Neither party will be asking the jury to consider a sentence of life.” Response of National Association of Criminal Defense Lawyers as Ami-cus Curiae Supporting Affirmance of the District Court's Appointment of Independent Counsel at 2, 8-9. "For this reason, it makes no difference why Mr. Davis joins the government in seeking a death verdict. All that matters is that there is no one asking the jury to consider life.” Id. at 9 n. 3 (emphasis in original).

. The majority adheres to the same errors that affected its other post-remand rulings in this case. In dissenting from this court's July 17, 2001 order granting mandamus and directing the district court to permit Len Davis to represent himself in the sentencing phase of this capital case despite his announced intention to seek the death penalty, I explained that both Davis and the majority misinterpreted the Supreme Court's decision in Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). On August 3, 2001, the same divided panel of this court denied the motion of Paul Hardy, Davis's convicted co-defendant, for leave to intervene for the purpose of filing a petition for panel rehearing, or, alternatively, requesting the appointment of amicus curiae to file a petition for panel rehearing, and/or suggesting rehearing en banc. I dissented from the August 3 order and suggested that the appointment of an amicus curiae was the proper remedy for the breakdown in the adversary system that resulted when Davis and the government joined forces to advocate for the death penalty. Because my colleagues again use the extraordinary writ of mandamus to vacate a district court decision that is not clearly and indisputably wrong, I dissent for a third time.

. Faretta, 422 U.S. at 818, 95 S.Ct. 2525.

. Id. at 818-19, 95 S.Ct. 2525. See Martinez v. Court of Appeal of California, 528 U.S. 152, 154, 120 S.Ct. 684, 145 L.Ed.2d 597 (2000) ("Our conclusion in Faretta extended only to a defendant’s 'constitutional right to conduct his own defense.’ Accordingly, our specific holding was confined to the right to defend oneself at trial.”) (citation omitted). See also United States v. Nixon, 418 U.S. 683, 709, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) ("The need to develop all relevant facts in the adversary system is both fundamental and comprehensive.”).

. Faretta, 422 U.S. at 835, 95 S.Ct. 2525.

. Id. at 834 n. 46, 95 S.Ct. 2525.

. Id. Furthermore, "[t]he right of self-representation is not a license to abuse the dignity of the courtroom ... [or] not to comply with relevant rules of procedural and substantive law.” Id.

. Id. at 846 n. 7, 95 S.Ct. 2525 (Burger, C. J., dissenting).

. 465 U.S. 168, 177 n. 7, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984) (citation omitted).

. 528 U.S. 152, 161, 120 S.Ct. 684, 145 L.Ed.2d 597 (2000).

. Id. at 162, 120 S.Ct. 684. See id. at 161-62, 120 S.Ct. 684 (listing some limitations upon the right: "The defendant must voluntarily and intelligently elect to conduct his own defense, and most courts require him to do so in a timely manner. He must first be made aware of the dangers and disadvantages of self-representation. A trial judge may also terminate self-representation or appoint standby counsel — even over the defendant’s objection — if necessary. We have further held that standby counsel may participate in the trial proceedings, even without the express consent of the defendant, as long as that participation does not seriously undermine the appearance before the jury that the defendant is representing himself. Additionally, the trial judge is under no duty to provide personal instruction on courtroom procedure or to perform any legal chores for the defendant that counsel would normally carry out.”) (internal quotations and citations omitted).

. Id. at 162-63, 120 S.Ct. 684.

. After this court reversed his federal death sentence and remanded his case for a new penalty trial, Len Davis informed the district court that he intended to represent himself in those proceedings but also consented to the presence of appointed "co-counsel.” The government first moved for a mental status examination of Davis and then filed an objection to this “hybrid representation.” In a pro se response to the government’s objection, Davis said:
I do not beg for my life, and I am not afraid to die. I have already informed the Court that I do not intend to present a defense at the penalty trial, and the government has filed pleadings with the Court stating that the decision is so bizarre that it calls into question my mental competence.

. Len Davis’s Original Brief, filed by his counsel in this court on June 8, 2001, states:
At various conferences and hearings before [the] district court Mr. Davis announced that he did not intend to present any evidence, or participate in any aspect of the trial, directed toward convincing the juty that he should not receive the death penalty....
... Mr. Davis believes that the[ ] legal issues [he plans to raise in a motion for new trial and/or Rule 2255 motion] will of necessity have to be viewed much more closely by the district and appellate courts if he is facing a death sentence, than they would if he were facing a life sentence. While he has no desire to die he has weighed carefully the prospects of a death sentence against spending the rest of his life in jail — and he finds life in prison to be more onerous. Believing that legal errors that led to his conviction will be examined more scrupulously if he has a death sentence facing him, Mr. Davis made the strategic decision that he does not want to put on mitigating evidence in an effort to convince the jury that he should not die....
... [W]e believe that the legal strategy which he has undertaken will likely result in his execution. Conversely we believe that if we could mount a full mitigation defense that there is a very good possibility we could save his life. That being so, why are we before this Court arguing a legal position which, if successful, would likely doom our client? The answer lies in the Faretta decision. It is his life, not ours. "The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails.” Faretta v. California, [422 U.S. 806, 820, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ].
Appellant's Opening Brief at 5-13 (June 8, 2001).
Moreover, at an August 3, 2001 status conference, Davis explained that his refusal to defend himself against the death penalty "is part of my strategy and I think that with the death sentence it will force the Court to take my issues a little more seriously.”

.As stated by the district court:
In this case, Davis has persisted in his intention that the jury not have the benefit of any mitigating evidence in the penalty *390 phase of his case. Most recently, he has declared that he wants nothing done at the penalty phase on his behalf at all. To permit Davis to withhold from the jury relevant mitigation undermines the integrity of the judicial process, defeats the reliability of the outcome and subverts our adversary system of justice. Davis in effect is appropriating to himself a judgment that only society, through the jury in this case, can properly make.
United States v. Davis, 150 F.Supp.2d 918, 926 (E.D.La.2001).

. 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (opinion of Stewart, Powell, and Stevens, JJ.).

. California v. Brown, 479 U.S. 538, 544, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987) (O'Connor, J., concurring) (internal citations omitted).

. Callins v. Collins, 510 U.S. 1141, 1151, 114 S.Ct. 1127, 127 L.Ed.2d 435 (1994) (Blackmun, J., dissenting).

. See id. at 1157, 114 S.Ct. 1127 (Blackmun, J., dissenting) ("In my view, the proper course when faced with irreconcilable constitutional commands is not to ignore one or the other, nor to pretend that the dilemma does not exist, but to admit the futility of the effort to harmonize them. This means accepting the fact that the death penalty cannot be *391 administered in accord with our Constitution."). But see id. at 1142-43, 114 S.Ct. 1127 (Scalia, J., concurring) ("Surely a different conclusion commends itself — to wit, that at least one of these judicially announced irreconcilable commands which cause the Constitution to prohibit what its text explicitly permits must be wrong.... [D]eath-by-injection ... looks pretty desirable next to ... some of the other cases currently before us which Justice Blackmun did not select as the vehicle for his announcement that the death penalty is always unconstitutional — for example, the case of the 11-year-old girl raped by four men and then killed by stuffing her panties down her throat. How enviable a quiet death by lethal injection compared with that!”) (citation omitted).

. In Lockett v. Ohio, Chief Justice Burger stated:
There is no perfect procedure for deciding in which cases governmental authority should be used to impose death. But a statute that prevents the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty. When the choice is between life and death, that risk is unacceptable and incompatible with the corn-mands of the Eighth and Fourteenth Amendments.
438 U.S. 586, 605, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion). In Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), a majority of the Court reaffirmed that a sentencer may not be precluded from considering, and may not refuse to consider, relevant mitigating factors. Attempting, perhaps, to harmonize the "two central principles" of the Court's Eighth Amendment jurisprudence, see supra text accompanying note 18, Justice Powell wrote:
Thus, the rule in Lockett followed from the earlier decisions of the Court and from the Court's insistence that capital punishment be imposed fairly, and with reasonable consistency, or not at all.... By holding that the sentencer in capital cases must be permitted to consider any relevant mitigating factor, the rule in Lockett recognizes that a consistency produced by ignoring individual differences is a false consistency.
Id. at 112, 102 S.Ct. 869.

. 492 U.S. 302, 328, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (quoting Woodson, 428 U.S. at 305).

. United States v. Davis, 180 F.Supp.2d 797, 798 (E.D.La.2001) ("Davis II").

. In re: Santa Fe Int'l Corp., 272 F.3d 705, 714 (5th Cir.2001) (internal quotation omitted).

. Maj. Op. at 382.

. See 18 U.S.C. §§ 3591-3598.

. Id. § 3593(b) (emphasis added).

. Id. § 3592(a) (emphasis added).

. See Save Our Wetlands, Inc. v. Sands, 711 F.2d 634, 641 (5th Cir.1983). See also Escondido Mut. Water Co. v. La Jolla Band of Mission Indians, 466 U.S. 765, 772, 104 S.Ct. 2105, 80 L.Ed.2d 753 (1984).

. See supra Part II. See also United States v. X-Citement Video, 513 U.S. 64, 73, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994) ("[W]e do not impute to Congress an intent to pass legislation that is inconsistent with the Constitution as construed by this Court.”).

. 5 Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional Law: Substance and Procedure § 23.17, at 256 (3d ed.1999). The Supreme Court delivered the classic state *393 ment of this principle in Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 5 L.Ed. 257 (1821):
What then, becomes the duty of the court? Certainly, we think, so to construe the constitution, as to give effect to both provisions, so far as it is possible to reconcile them, and not to permit their seeming repugnancy to destroy each other. We must endeavor so to construe them, as to preserve the true intent and meaning of the instrument.
Chief Justice John Marshall, who wrote the Cohens opinion, had previously stated in Marbury v. Madison, 5 U.S. (1 Cranch) 137, 174, 2 L.Ed. 60 (1803), that “[i]t cannot be presumed (hat any clause in the constitution is intended to be without effect....”

. See, e.g., Nebraska Press Ass’n v. Stuart, 427 U.S. 539, 561, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976) (refusing to declare the Sixth Amendment rights of an accused subordinate, in all circumstances, to the First Amendment right of the press to publish).

. More accurately, this case presents this conflict in its present posture. I remain convinced that the district court reached the correct result in its May 16, 2001 order by refusing to allow Len Davis to waive his right to counsel and use self-representation to make no defense against the death penalty. See United States v. Davis, 150 F.Supp.2d 918 (E.D.La.2001). My confidence in this result reflects the Supreme Court's recognition of exceptions and limitations to the right of self-representation. See supra notes 4-13 and accompanying text. But the majority nevertheless issued a writ of mandamus on July 17, 2001 requiring the district court to accept Davis's waiver of counsel and self-representation. That order created the conflict between Sixth and Eighth Amendment interests that the district court addressed through its appointment of independent or amicus curiae counsel.

. Mapp v. Ohio, 367 U.S. 643, 657, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

. 486 U.S. 153, 159, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988).

. Id. (internal quotation omitted).

. United States v. Chagra, 701 F.2d 354, 361 (5th Cir.1983) (Rubin, J.).

. Davis II, 180 F.Supp.2d at 798 n. 2.

. The appointment of independent counsel is completely consistent with Faretta and McKaskle. See supra text accompanying notes 9-10.

. Maj. Op. at 382.

. Id. at 383 (quoting United States v. Cox, 342 F.2d 167, 171 (5th Cir.1965)).

. The Supreme Court's “self-representation” jurisprudence also does not support the majority's requirement that all mitigating evidence received at the federal capital sentencing hearing be presented by the convicted defendant or with his blessing. See Faretta v. California, 422 U.S. 806, 846 n. 7, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) (Burger, C. J„ dissenting) ("Some of the damage we can anticipate from a defendant's ill-advised insistence on conducting his own defense may be mitigated by appointing a qualified lawyer to sit in the case as the traditional 'friend of the court.' The Court does not foreclose this option.”); McKaskle v. Wiggins, 465 U.S. 168, 177 n. 7, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984) (“A pro se defendant must generally accept any unsolicited help or hindrance that may come from ... an amicus counsel appointed to assist the court.”) (citation omitted).

. Maj. Op. at 383.

. Davis II, 180 F.Supp.2d at 799-800. See United States v. Louisiana, 751 F.Supp. 608, 620 (E.D.La.1990), and the authorities cited therein. See also supra note 42.

. 13 Charles Alan Wright et al., Federal Practice and Procedure § 3530, at 319 (2d ed.1984). See also United States v. Chagra, 701 F.2d 354, 361 (5th Cir.1983) (Rubin, J.).

. See supra Parts II-III.A.

. This dearth of case law reflects that prior to 2001, the federal government had not executed a civilian since 1963. Timothy James McVeigh, convicted of the April 1995 bombing of the Alfred P. Murrah Federal Building in Oklahoma City, was executed on June 11, 2001. His immediate predecessor to federal capital punishment was convicted murderer Victor Feguer, who was executed on March 15, 1963.

. See Davis II, 180 F.Supp.2d at 804-07.

. 782 So.2d 343, 363-64 (Fla.2001) (footnotes omitted) (emphasis added).

. 686 N.E.2d 1264 (Ind. 1997).

. See id. at 1276.

. Id.

. Id.

. Id.

. 18 U.S.C. § 3593(c).

. See id. § 3593(d).

. Davis II, 180 F.Supp.2d at 806.

. See, e.g., People v. Bloom, 48 Cal.3d 1194, 259 Cal.Rptr. 669, 774 P.2d 698 (1989).

. 528 U.S. 152, 162, 120 S.Ct. 684, 145 L.Ed.2d 597 (2000).

. Id. at 163, 120 S.Ct. 684.

. Id.

. In the words of Justice Thurgood Marshall, "[a] defendant's voluntary submission to a barbaric punishment does not ameliorate the harm that imposing such a punishment causes to our basic societal values and to the integrity of our system of justice.” Whitmore v. Arkansas, 495 U.S. 149, 173, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (Marshall, J„ dissenting). Consequently, cases such as the one before us do not
involve a capital defendant's so-called "right to die.” When a capital defendant seeks to circumvent procedures necessary to ensure the propriety of his conviction and sentence, he does not ask the State to permit him to take his own life. Rather, he invites the State to violate two of the most basic norms of a civilized society — that the State's penal authority be invoked only where necessary to serve the ends of justice, not the ends of a particular individual, and that punishment be imposed only where the State has adequate assurance that the punishment is justified. The Constitution forbids the State to accept that invitation.

Id.

. Eddings v. Oklahoma, 455 U.S. 104, 112, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).

. Moreover, the disintegration of the adversarial nature of the sentencing proceeding raises a serious jurisdictional question. See 13 Wright et al., supra note 45, § 3530, at 317 (“The principle remains today that if both parties affirmatively desire the same result, no justiciable case is presented.”).